U.S. EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION, Robert La-
Rocca, and William Lacy, Plaintiffs,

v.

REPUBLIC SERVICES, INC. and
Republic Silver State Disposal,
Inc., Defendants.

Robert LaRocca and William
Lacy, Plaintiffs,

v.

Republic Services, a Delaware corpora-
tion, Republic Silver State Disposal, a
Nevada corporation, and Does 1
through 25, Defendants.

Nos. CV–S–04–1352 DAE(LRL),
CV–S–04–1479–DAE(LRL).

United States District Court,
D. Nevada.

Feb. 16, 2009.

Anna Park, Sue J. Noh, Thomas S. Lepak, Karen E. Nutter, U.S. Equal Employment Opportunity Commission, Los Angeles, CA, Connie Liem, U.S. Equal Employment Opportunity Commission, San Diego, CA, Angela D. Morrison, Nevada Immigrant Resource Project, Scott B. Olifant, Law Office of Scott B. Olifant, Las Vegas, NV, for Plaintiffs.

Bruce C. Young, Patrick H. Hicks, Matthew G. Laflin, Roger L. Grandgenett, Wesley C. Shelton, Littler Mendelson, PC, Las Vegas, NV, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT REPUBLIC SILVER STATE DISPOSAL, INC. AND REPUBLIC SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES; ORDER DENYING DEFENDANTS' MOTION TO STRIKE NEW PORTIONS OF PLAINTIFFS LACY'S AND LAROCCA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DECLARATION OF GERALD BENFORD*

DAVID ALAN EZRA, District Judge.

On December 5, 2008, the Court heard Defendants' Motion for Summary Judgment or Summary Adjudication of Issues. (Doc. # 208.) Scott B. Olifant, Esq., appeared at the hearing on behalf of Plaintiffs William Lacy and Robert LaRocca; Sue J. Noh, Senior Trial Attorney, appeared at the hearing on behalf of Plaintiff EEOC; Bruce C. Young, Esq., and Roger L. Grandgenett, Esq., appeared at the hearing on behalf of Defendants. After reviewing the motion and the supporting and opposing memoranda, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment.

The Court GRANTS the summary judgment motion with respect to the disparate treatment claims of the following individuals: Randy Johnson; Daron Barnes–Reid; Eddie Wilson; Roderick Jones; Curtis Howard; Jesus Chanez; Lorrance Wilder, Jr.; Carlos Rasool as to the driver position; Albert Vassar; Dock Hines; Jimmy Hilton; James Cornell; Timothy Gittus; Jon Krieger; Elmo Walker; Laura Lucido; William Adams; Louis "Buster" Thomas; and Michael Barnes.[1]

Accordingly, this Court GRANTS summary judgment in favor of Defendants with respect to those claims.

---

1. This Court notes that EEOC has voluntarily dismissed claims brought by Debra Cote, Billy Bradley, Donald Whittle, and William Anstett.

The Court DENIES the motion with respect to the disparate treatment claims of the following individuals: Jeffrey Banks; Ron Thompson, Sr.; Vincent Marrazzo; Manual Encinas; Carlos Rasool as to the mechanic position; Billy Taylor; David Suazo; Keith Brown; Mid Jackson; Nico Kelley; Eddie Williams; William Lacy; Robert LaRocca; Clayton Hickman; Kevin Stockton; Sharon Derengowski; Bernard Lucido; Michael Miller; and Jessie Williams.

This Court GRANTS the motion with respect to the EEOC's pattern and practice claim.

Pursuant to Nevada Local Rule Part II, 78–2, the Court finds the motion to strike suitable for disposition without a hearing. After reviewing the motion, and the supporting and opposing memoranda, the Court DENIES Defendants' Motion to Strike New Portions of Plaintiffs Lacy's and LaRocca's Opposition to Defendants' Motion for Summary Judgment and Declaration of Gerald Benford. (Doc. # 225.)

### BACKGROUND

The Equal Employment Opportunity Commission ("EEOC") has brought suit pursuant to the Age Discrimination in Employment Act ("ADEA") against Defendants Republic Services, Inc. ("RSI") and Republic Silver State Disposal, Inc. ("RSSD") (collectively "Defendants") on behalf of a class of 36 individuals who were terminated from employment allegedly based on their age of 40 years or older. Plaintiffs Lacy and LaRocca have also brought ADEA claims. The EEOC's case was consolidated with the lawsuit brought by the individual Plaintiffs William Lacy and Robert LaRocca.

Defendants collect trash in the Las Vegas area. RSI is the parent company of RSSD. Defendants have various facilities in Nevada including: the Cheyenne Transfer Station; the Sloan Transfer Station; the Henderson Transfer Station; and the Las Vegas administrative office. The claimants fall into three groups: foremen, administrative support, and trash-collection.

On July 18, 2008, Defendants filed the instant motion for summary judgment seeking dismissal of all claims by all individuals in both cases. (Doc. # 208.) Plaintiffs Lacy and LaRocca filed an opposition on July 29, 2008. The EEOC filed an opposition on August 5, 2008. Defendants filed a reply to Lacy and LaRocca's opposition on August 12, 2008. Defendants filed a reply to the EEOC's opposition to their summary judgment motion on September 4, 2008.

Defendants also filed on August 12, 2008, a Motion to Strike New Portions of Plaintiffs Lacy's and LaRocca's Opposition to Defendants' Motion for Summary Judgment and Declaration of Gerald Benford. (Doc. # 225.) Plaintiffs Lacy and LaRocca filed an opposition on August 15, 2008. Defendants filed a reply on August 29, 2008.

On November 26, 2008, this Court granted Defendants' Motion to Strike EEOC's declaration of Marla Stern and portions of the EEOC's opposition and exhibits relating to Marla Stern's declaration and purported statistical analysis. (Doc. # 243.) This Court denied the EEOC's motion for reconsideration of that order on February 13, 2009.

Because the factual background is lengthy, this Court will discuss the facts in the discussion section as they pertain to each particular claimant.

### STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Porter v. Cal. Dep't of Corrections,* 419 F.3d 885, 891 (9th Cir.2005); *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000). A main purpose of summary judgment is to dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id.* at 323, 106 S.Ct. 2548. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000). The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings. *Porter,* 419 F.3d at 891 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers. *S. Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 889 (9th Cir.2003); Local Rule 56.1(f) ("When

resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties."). "[A]t least some 'significant probative evidence'" must be produced. *T.W. Elec. Serv.,* 809 F.2d at 630 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu,* 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv.,* 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. *Porter,* 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. *Id.* However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 631.

## DISCUSSION

The ADEA makes it unlawful "to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). Plaintiffs have brought claims against Defendants for age discrimination under both a theory that specific individuals were subjected to disparate treatment based upon their age, and a theory that Defendants engaged in a pattern and practice of intentional age discrimination. The EEOC ar-

gues that Defendants implemented a reduction-in-force in name only, but later advertised for the very jobs that they eliminated. The EEOC also asserts that it has direct evidence of age bias because Defendants' top executives allegedly made age-biased comments in connection with the reduction-in-force and fostered a corporate culture of open hostility to older workers.

This Court will first address the disparate treatment cause of action as it pertains to each individual employee and then this Court will discuss the pattern and practice cause of action. The various individuals in this lawsuit worked in different positions, at different locations, and some were covered by a collective bargaining agreement, while others were not. This Court also notes that Defendants made a motion to strike Gerald Benford's declaration used by Plaintiffs Lacy and LaRocca. (Doc. # 225.) That motion is discussed separately herein.

## I. *Disparate Treatment Cause of Action*

■ In order to establish a disparate treatment claim, the plaintiff must produce evidence that gives rise to an inference of unlawful discrimination, either through direct evidence of discriminatory intent or through the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir.2003); *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.2008).

■ Direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir.1998) (internal quotation marks omitted) (alteration in original). In the context of an ADEA claim, direct evidence "is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem–Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (citation, internal quotation marks, and ellipses omitted). "When a plaintiff has established a prima facie inference of disparate treatment through direct or circumstantial evidence, he will necessarily have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision[.]" *Id.* (citation and brackets omitted).

■ Where no direct evidence exists, the plaintiff must proceed under the *McDonnell Douglas* framework. Under that framework, the plaintiff must first establish a prima facie case of discrimination. *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). To prove a prima facie case of an ADEA violation, the plaintiff must show he or she was: "(1) at least forty years old, (2) performing his job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz*, 521 F.3d at 1207 (citation omitted).

■ As noted by the Ninth Circuit in *Diaz*,

[g]enerally, an employee can satisfy the last element of the prima facie case only by providing evidence that he or she was replaced by a substantially younger employee with equal or inferior qualifications. The test for the prima facie case changes somewhat, however, where a discharge occurs in the context of a general reduction in the employer's workforce. In this context, circumstantial

evidence other than evidence concerning the identity of a replacement employee may also warrant an inference of discrimination. The reason for this difference is that in most reduction-in-force cases no replacements will have been hired.

*Id.* at 1209 n. 3. The fourth prong may be met by "showing the employer had a continuing need for [the employees'] skills and services in that their various duties were still being performed ... or by showing that others not in their protected class were treated more favorably." *Id.* at 1207–08 (citations and internal quotation marks omitted).

■ If the plaintiff meets the prima facie burden, he or she is entitled to a presumption of discrimination. *Id.* at 1207. "[T]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory, reason for the challenged action." *Chuang,* 225 F.3d at 1123–24 (internal quotation marks and citation omitted). If the employer provides a legitimate non-discriminatory reason, the *McDonnell Douglas* presumption drops out of the picture.

■ "The final stage of the *McDonnell Douglas* analysis requires [the plaintiff] to raise a genuine issue of fact concerning whether the facially legitimate reasons proffered by [the employer] are pretextual." *Diaz,* 521 F.3d at 1212. Pretext can be established "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang,* 225 F.3d at 1123–24 (internal quotation marks and citation omitted).

■ "A showing that the [employer] treated similarly situated employees outside [the plaintiff's] protected class more favorably would be probative of pretext." *Vasquez,* 349 F.3d at 641. Individuals must be similarly situated "in all material respects." *Moran v. Selig,* 447 F.3d 748, 755 (9th Cir.2006). "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez,* 349 F.3d at 641. The misconduct engaged in by the employees must be "of comparable seriousness." *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

■ The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Aragon v. Republic Silver State Disposal Inc.,* 292 F.3d 654, 659 (9th Cir. 2002). "As a general matter, [however,] the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Diaz,* 521 F.3d at 1207 (citation and internal quotation marks omitted).

A. *Employees Allegedly Terminated for Attendance Issues*

The Collective Bargaining Agreement ("CBA") between the Employer and the Teamsters Union Local 631 covers certain former employees at issue in this suit. The attendance provision of the CBA provides that employees may be terminated if, beginning on June 11 of each year, they have more than ten unexcused absences in one year. In addition, an employee may be terminated where they have more than five no-call/no-show incidents in a six-month period. Finally, an employee may be terminated for three consecutive no-call/no shows.

A doctor's note will allow multiple days off due to a medical reason to be counted as only one incident for purposes of the attendance policy. However, the first day of missed work, even if excused by a doctor, counts as an incident. If an employee returns to work after an excused illness

and then goes out again with another doctor's note, the subsequent absence will be counted as another incident day. (Defs.' Ex. 42 at 12.)

With respect to the following individuals, the EEOC argues that the attendance policies were not consistently enforced between younger and older workers.

### 1. *Jeffrey Banks*

[14] Jeffrey Banks, born 1962, was hired by Silver State Disposal. In June 2003, Banks worked as a Commercial Front–Loader Driver at the Cheyenne Transfer Station. The attendance records indicate that on February 26, March 7, May 13, June 7, and June 20, 2003, Banks either failed to call in to report an absence or was late to work. The attendance records also indicate that Banks failed to appear for work without providing notice on June 21, 2003. Defendants considered this failure to be Banks's sixth no-call/no-show incident in a 180–day period. Defendants, therefore, terminated Banks in June 2003, pursuant to the CBA provision which states that employees may be terminated after six no-call/no-show incidents.

Because the EEOC has not presented direct evidence of age bias with respect to Banks, the EEOC must proceed through the *McDonnell Douglas* framework by proving a prima facie case and presenting evidence of pretext. The EEOC argues that it can establish the second prong of Banks' prima facie case because he had only three or four no-call/no-shows in the 180–day period, not six no-call/no-shows. First, the EEOC states that Banks returned to work on June 19, 2003, but was told by his supervisor Chris Hannah to get another note from his doctor since Banks was still injured. Banks believed that he was on medical leave on June 20, 2003, and that his supervisor Chris Hannah was aware of this. The EEOC, therefore, argues that the June 20 and June 21, 2003

absences should not have been counted as no-call/no-show incidents. In addition, on June 24, Banks provided a doctor's note dated June 19, 2003, which covered his absences from June 19 to 24, 2003, and he also had a doctor's note covering the period of June 12 through June 19, 2003. The EEOC argues that this entire period should be counted as one absence because the doctor's note covers this period.

Banks did not report to work on June 26, 2003. Banks states that he was terminated on June 23 or 24, days before June 26, 2003. Defendants claim they accepted his late doctor's note and voided the earlier termination and instructed Banks to show-up for work on June 26. When Banks did not call or show up for work on the June 26, 2003, his employment was terminated.

Banks argues that even if June 26 were counted as a no-call/no-show, it was not his sixth incident and could only be counted as his fifth incident because the June 20 and June 21 alleged no-call/no show incidents were voided by the provision of his doctor's note.

Because some of the possible no-call/no-shows were excused, there is a question of fact as to whether Banks actually violated the attendance policy and/or whether it was reasonable for Defendants to believe he violated the policy. Taking the evidence in the light most favorable to the EEOC, it is sufficient to prove the second prong of the prima facie case that Banks was satisfactorily performing his duties.

The EEOC next argues that it can prove the fourth prong of its prima facie case and pretext because younger employees were retained despite violating the attendance policy. For example, Michael Jones, age 18 at the time, violated the attendance policy seven times during his four months of employment as a casual employee. In addition, casual employee Geraldine Lacy,

born 1968, had eight no-call/no-show and tardies between April 11 and 19, 2003, but was not terminated until after the ninth incident. Donavin Morgan, age 22, had six no-call/no-shows in less than two months, yet continued to work for Defendants until August 2005, when he was terminated for insubordination.

Defendants counter that casual employees are not held to the same attendance standards as regular employees and that each of the younger comparators listed by the EEOC were casual employees, whereas Banks was a regular employee. In addition, there is no evidence that casual employees had the same supervisor as Banks. Thus, Defendants argue that the comparators are not similarly situated to Banks.

Defendants further state that during a seven-year period, 32 regular employees at the Cheyenne Transfer Station were terminated for their sixth no-call/no-show attendance violation. Of those 32 employees, only seven were over the age of 40.

Defendants' arguments are unpersuasive as a matter of law because although Defendants claim that casual employees are not subject to the same attendance standards as regular employees, Defendants also stated that they often hold casual employees to the same standard as regular employees. In addition, although only seven of 32 persons terminated were over 40, evidence was not presented as to how many persons over 40 were employed such that the court could make a percentage comparison. Therefore, given that there is a question of fact as to whether Banks actually violated the attendance policy and whether it was reasonable for Defendants to believe that the policy had been violated, taking the facts in the light most favorable to the EEOC as the non-moving party, there is a question of fact as to whether an inference of age discrimination has been raised. Although the EEOC's evidence is not particularly strong, it is sufficient to raise a question of an inference of age discrimination. For these reasons, the motion with respect to Banks is DENIED.

### 2. *Ron Thompson, Sr.*

██ Ron Thompson, Sr., born 1964, was hired on June 20, 2002, as a casual pitcher at the Cheyenne Transfer Station Commercial Rear–Loader business line. Thompson became a regular employee on March 4, 2003, and states that he understood the proper procedure for reporting an anticipated absence.

Thompson was listed as a no-call/no-show on February 3, March 28, April 2, April 9, and June 7, 2004. Thompson received an Employee Corrective Notice on June 8, 2004, which he signed, warning him that he had reached his fifth attendance violation in the past six months and that further violations would result in termination. On July 30, 2004, Thompson called in to notify his supervisor that he would be late for his shift. Defendants noted that his call was received at 8:01 p.m. Defendants terminated his employment for the sixth violation of the attendance policy, as set forth in the CBA. In his termination notice, Thompson stated that he called in at 7:58 p.m. and that he assumes that the discrepancy in time was because it took a few minutes for the tape to run out.

The EEOC asserts that Thompson's termination was pretext for age discrimination because younger employees with more attendance violations were not terminated. For example, the EEOC refers to the following three employees who were discussed with respect to Banks: casual employee Michael Jones, age 18 at the time, violated the attendance policy seven times during his four months of employment as a casual employee, casual employee Geraldine Lacy, born 1968, had eight no-call/no-

show and tardies between April 11 and 19, 2003, but was not terminated until after the ninth incident. Casual employee Donavin Morgan, age 22, had six no-call/no-shows in less than two months, yet continued to work for Defendants until August 2005, when he was terminated for insubordination. In addition to the employees set forth under Banks, Maurice Calcote, born 1969, was a no-call/no-show six times in a six-month period but was not terminated. Despite these excessive absences, Mr. Paul Labruzzo allowed him to voluntarily resign.

Defendants respond that regrettably, a mistake was made in counting the no-call/no-shows for Calcote. Defendants also state that Calcote was allowed to voluntarily resign because a resignation would allow him to more easily get another job after his incarceration. Defendants also counter that these four comparators are insufficient to create a genuine issue of fact, especially in light of the fact that the EEOC located only one clerical counting error out of the more than 900 employee files produced, and that of the 40 regular employees at the Cheyenne Transfer Station who were terminated for their sixth attendance violation, only ten were over the age of 40. This Court disagrees with Defendants.

Although Thompson does not dispute that the call was not registered until 8:01 p.m. or that it was his sixth violation in six months, given that Defendants treated younger casual employees better by allowing them more violations of the attendance policy, and taking the evidence in the light most favorable to the EEOC, Thompson has provided enough evidence to show that he was satisfactorily performing his duties.

In addition, three of the comparators were casual employees as was Thompson. Given that Defendants should enforce the attendance provisions of the CBA evenly across transfer stations and given that

there is no explanation as to why these three younger employees were allowed more violations, Thompson has created a genuine issue of fact regarding pretext. Although the EEOC's evidence is weak, it is enough to survive summary judgment. Summary judgment is therefore DENIED with respect to Thompson's claims.

### 3. *Randy M. Johnson*

Randy Johnson, born 1954, was hired by RSSD on August 2, 2004, to work at the Henderson Transfer Station. It is disputed as to whether he was hired as a casual diver/pitcher or to work in the roll-off department. Johnson was required to report to work every morning to see what this specific job assignment would be. Johnson reported to work for seven or eight days, but was not selected to work. He, therefore, chose to stop coming to work.

Johnson states that he stopped reporting for work because he was the only trained roll-off driver among the casual employees waiting for work and he could no longer afford to go without pay. Johnson questioned why he had not been selected for work and was told that the person who was selecting employees was getting to it and did not forget him. Johnson, who was hired by the personnel office, asked his trainer "Sarge" why he was not being selected for work, and Sarge replied "the old guys ain't got a chance" and that the new supervisor did not want anybody that old. (EEOC Ex. 28 at 74–75.) Johnson also testified that the person in charge of selecting causal employees for assignment to roll-off trucks never made any age-related comments to him, about him, or about any other employee. Likewise, the supervisor, Brown, never made any age-related comments to him. Johnson did not complain to human resources that he felt he was not being selected for work because of his age.

After not being selected for work for seven or eight days, Johnson decided not to report to work anymore. Defendants considered Johnson to be a no-call/no-show for three consecutive days of scheduled work on August 27, 30, and 31, 2004. The line supervisor terminated Johnson pursuant to the attendance policy.

The EEOC points to the three comparators discussed above under Banks, (e.g.- Morgan, Lacy, and Jones) as younger employees who were not terminated although they violated the attendance policy. The EEOC also points to a younger employee, James Linton, who was a no-call/no-show for two months. The EEOC states that although Linton was incarcerated, it appeared that he had not requested a leave of absence until after he was a no-call/no-show for months.

Between January 2001 and May 2006, 41 casual pitcher/drivers at the Henderson Transfer Station were terminated for violating the three-day no-call/no-show attendance policy. Of those 41 employees, only ten were over the age of 40. In addition, Pablo Beauchamp, born 1951, was hired as a casual employee in June 2004. Beauchamp is older than Johnson and he remained employed by Defendants.

It is undisputed that Johnson decided not to report to work and was a no-call/no-show for three consecutive days. The only question is whether Johnson can prove a constructive discharge claim. This Court finds that Johnson does not meet that high standard.

■■■ Where an employee quits or retires they must prove that they were constructively discharged. "Constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood

and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir.2000). To prove a constructive discharge claim, "a plaintiff must show there are triable issues of fact as to whether a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1184 (9th Cir. 2005), as amended by, 433 F.3d 672 (9th Cir.2006); *see also Watson v. Nationwide Ins., Co.*, 823 F.2d 360, 361 (9th Cir.1987) (a plaintiff must show that their working environment was "so intolerable and discriminatory" that a reasonable employee would be compelled to quit). The plaintiff must show that "the abusive working environment became so intolerable that [his] resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

■■■ The standard to prove a constructive discharge claim is higher than that required to prove a hostile work environment claim. *Brooks*, 229 F.3d at 930 ("[w]here a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job."). A plaintiff must at least show some aggravating factors that compelled him or her to quit, such as a continuous pattern of discriminatory treatment. *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1412 (9th Cir.1996).

■■■ Here, the EEOC has not provided sufficient evidence to create a genuine issue of fact regarding constructive discharge for Johnson. One comment made by a trainer, and not being assigned to work for seven days is insufficient to cre-

ate a factual issue of whether there was a pattern of discriminatory conduct or working conditions so intolerable based upon discrimination that a reasonable person would have quit.

Moreover, an inference of discrimination is not raised by the alleged comparator evidence because the three younger persons referred to by the EEOC worked at a different transfer station and were being dispatched by different supervisors. Even if they were to be compared with Johnson, the attendance record for one of the younger employees, Jones, shows that he reported but was not selected for work for ten days in a row, more days than Johnson. Finally, Linton was a no-call/no-show because he was incarcerated.

For these reasons, summary judgment is GRANTED in favor of Defendants on Johnson's claim.

### 4. Daron Barnes–Reid

[20] Daron Barnes–Reid, born 1961, was 43 years old when he was hired by RSSD at the Cheyenne Transfer Station on September 13, 2004. He became a regular employee effective May 12, 2005. On October 17, 2005, Barnes–Reid received a corrective notice warning him that he had reached his limit of ten incidents of absences as set forth in the CBA for missing work on June 13 and 17, July 1, 15, and 19, August 4 and 12, September 11 and 19, and October 14, 2005. Barnes–Reid was terminated on October 30, 2005, for failing to report for work that day, which according to Defendants, resulted in eleven incidents of absences in one year.[2]

Barnes–Reid disputes that there were ten incidents of absences. Barnes–Reid states that he did not improperly miss work on the following five days, June 13 and 17, July 1, 15, and 19, 2005. Barnes–Reid has provided evidence that on each of those days he was manually clocked in. He argues that the reverse-seniority system should apply to those dates. Foreman Freddie Stampley testified that manually-clocking in and be replaced was known as reverse-seniority and was allowed between 1995 and 2006 on days when the company had enough drivers and the most senior drivers either with the company or the union were allowed to go home without the day counting as an absence.

Barnes–Reid testified that the reverse-seniority system should apply to the five days in question because he had recently had a surgery and was on medication for the pain and Stampley was aware of that. Barnes–Reid testified that he told his union representative about that and his union representative stated that Stampley should have allowed the reverse-seniority system to apply to him given that he was sick.[3]

In addition to the dates above, Defendants state that Barnes–Reid was a no-call/no-show on the following five days: May 12, 30, and 31, and October 2, 24, and 28, 2005. Barnes–Reid disputes that he was a no-call/no-show on four of the days. Defendants' attendance records show that Barnes–Reid was manually clocked in on May 30 and 31. Barnes–Reid states that he should have been replaced on these days under the reverse-seniority policy discussed above. In addition, Barnes–

---

2. Barnes–Reid discussed his termination with the union and the union did not pursue any grievance through arbitration. Defendants argue therefore that they did not violate the attendance policy. It is unclear, however, as to why the union did not pursue the grievance.

3. Defendants assert that the reverse-seniority system could not have applied to Barnes–Reid because he became a regular employee only on May 12, 2005, and he therefore would have been one of the least senior roll-off drivers. This argument however, does not address whether Barnes–Reid had seniority with the union.

Reid had a doctor's note for October 24th, and May 12 was his regularly scheduled day off. Thus, Barnes–Reid states that only two of the dates listed above should count as a no-call/no-show absence, not six.

Barnes–Reid testified that he believed older employees were assigned the outlying routes because those routes were less desirable and assignment of such routes was viewed as punishment.

Of the 21 regular employees at the Cheyenne Station who were terminated for excessive absences, only seven were over 40 years old.

Defendants assert that Barnes–Reid cannot establish that the reverse-seniority policy should have applied to him for the days in question. This Court agrees. All Barnes–Reid has shown was that there was a reverse-seniority practice in place and that the attendance records show that Barnes–Reid was manually clocked in. There is no evidence, even from Barnes–Reid himself, that Barnes–Reid showed up for work on the dates in question and asked that the reverse-seniority system apply to him, that he was eligible for the system based upon seniority, or that anyone had told him that those days would not count against him because of the system. Moreover, Stampley had no recollection of Barnes–Reid requesting reverse seniority.

Finally, even if May 12 and October 24 did not count as absences based upon the regularly scheduled day off and the doctor's note, Barnes–Reid still exceeded the allotted ten absences when he failed to report to work on October 30, 2005. Accordingly, the EEOC has not shown that Barnes–Reid was satisfactorily performing his duties or that the attendance policy was misapplied to him.

Moreover, even if one or two of the dates were mistakenly counted as absences and Barnes–Reid did not incur the maximum number of absences, the EEOC has not presented any evidence showing pre-text. Barnes–Reid's testimony pertaining to alleged age-bias relates to assigning allegedly undesirable routes to older employees. It did not pertain to the application of the attendance policy. Moreover, Barnes–Reid did not identify any specific younger comparators.

Accordingly, summary judgment is GRANTED in favor of Defendants with respect to Barnes–Reid's claim.

### 5. *Eddie Wilson*

Eddie Wilson, born 1951, was hired by Silver State Disposal in December 1996 as a casual pitcher. Wilson was 45 years old at the time. Wilson left after a few weeks and was re-hired in 1997 as a transfer truck driver. In June 2003, Wilson worked as a Roll–Off Driver at the Cheyenne Transfer Station.

On June 17, 2003, Wilson called into the hotline to report he would be out sick. Wilson spoke to his supervisor Gene Harris on June 18, 2003, and June 21, 2003, and informed him that he could not work due to illness. Wilson admittedly did not call in on June 19, 20, 22, 23, or 24. Wilson was terminated on June 23, 2003, for failing to call in or otherwise report to work for three consecutive days, as required by the CBA. A termination letter was mailed to him, but was returned undelivered. On June 25, 2003, Wilson submitted notes from his doctor for his absence. Wilson filed a grievance with his Union over his termination, but his Union did not pursue it because he did not have a case.

During the time frame in question, 42 union employees were terminated from the Cheyenne Transfer Station for the violating the three-day no-call/no-show attendance rule. Of those 42 persons, only nine were over the age of 40.

At sometime prior to his termination, foreman Harris allegedly made a few comments to Wilson, referring to Wilson as "old man."

The EEOC argues that the above evidence proves pretext. This Court will first address the remarks of "old man." In general, " 'stray' remarks are insufficient to establish discrimination." *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438 (9th Cir.1990) (citations omitted). In *Merrick,* the Ninth Circuit held that a comment by the decision-maker that he chose a certain employee because he was a bright young man was insufficient to raise a triable issue of fact of whether the decision-maker refused to promote the plaintiff based upon the plaintiff's age. It was held to be a stray remark that did not show that the decision not to promote was based on age. *Id.* at 1438–39; *Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir.1993) (supervisor's use of the phrase we "don't necessarily like grey hair" was uttered in an ambivalent manner and was not tied directly to the employee's termination, thus, "it is at best weak circumstantial evidence of discriminatory animus"); *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420–21 (9th Cir.1990) (use of the phrase "old-boy network" did not support inference of discriminatory motive). Here, the use of the term "old man" a few times has not been connected to Wilson's termination either in conduct or in closeness of time. They are therefore nothing more than stray remarks, which are insufficient to constitute direct evidence of age discrimination.

Therefore, the EEOC must prove a prima face case of discrimination through the burden shifting framework set forth in *McDonnell Douglas.* The EEOC cannot meet this burden. The EEOC argues that the termination reason was pretextual because Wilson called in and sub-

mitted a doctor's note for the period from June 17, 2003 to August 7, 2003. In addition, the EEOC cites to one younger employee, Jacob Mines, who allegedly violated a different part of the attendance policy by having more than 12 absences in less than six months but was not fired. Even if this could establish pretext, however, which it does not, the EEOC has not provided sufficient evidence of a prima facie case of discrimination. The EEOC has not shown, as it argues, that Wilson did not violate the no-call/no-show rule. Even if a termination date of June 23rd was premature because Wilson called his supervisor on June 21, Wilson admitted that he did not call and did not show up for work on June 22, 23, or 24, 2003. Accordingly, Wilson violated the no-call/no-show rule on these three dates. Indeed, Wilson's union did not believe that Defendants violated the CBA with respect to terminating his employment for violating the three consecutive day no-call/no-show rule. Therefore, the EEOC cannot establish that Wilson was satisfactorily performing his duties.

Accordingly, summary judgment is GRANTED in favor of Defendants on Eddie Wilson's claim.

### 6. *Roderick Jones*

Roderick Jones, born April 18, 1959, was 44 years old [4] when he was hired as a casual pitcher/driver by RSSD on December 24, 2003. Jones worked 5.5 hours on December 29, 2003. Jones testified that he was assigned to work with a younger man who asked him "you up for this old man?" The younger co-worker threw a trash can, which accidently hit Jones in the mouth. Jones went home early that day.[5]

---

4. Although Jones was the same age when he was hired and terminated, he was hired and terminated by different people.

5. The EEOC argues that the younger co-workers' comment and accident might be a man-

ifestation of the "break him off" technique where younger workers tried to mistreat older workers to make them quit, with the tacit understanding of the foreman. As acknowledged by the EEOC, however, this is only

Jones was not selected to work on December 30 and 31, 2003, January 1 and 2, 2004. Defendants attendance records show that Jones did not report for work or call in on January 3, 5, 6, and 7, 2004. Jones testified that he reported for work, but was not selected, for a period of three weeks. Jones testified that after these three weeks, he decided to stop reporting for work. Pursuant to the terms of the CBA, due to the failure to report to work for three consecutive days, Jones was terminated.[6]

Jones testified that while he and two other guys, whom he believed were his age, were sitting on a bench waiting for assignments, supervisors pointed to them and said that they were "out of their minds" if they believed they would be selected for work because the job would "f— them up." (EEOC Ex. 29 at 36–37.) Jones believed this statement was made because of his age. Jones also testified that people in their twenties were being selected for work.

Ten individuals were hired on the same day as Jones in the residential line of business at the Cheyenne Transfer Station, five of whom were over the age of 40. Of those five individuals, Jones was the only one who stopped reporting for work. The other four individuals remained employed by Defendants as of May 2006, two-and-a-half years later. In addition, the oldest person hired on the same day as Jones, Sherdell Mardis, was almost nine years older than Jones and remains employed by Defendants. Only the following two employees, who were hired on the

same date as Jones have been terminated: Javon Howard, born 1979, and Roger Hughes, born 1983. Hughes was the youngest person hired on the same date as Jones.

During 2003, 165 residential drivers were hired at the Cheyenne Transfer Station, 31 of whom were over the age of 40 and 134 of whom were under the age of 40. As of July 2006, 11 of the 31 employees over the age of 40 remained employed, representing 35.5%. Of the 134 employees who were under 40 when hired, 41 remained employed as of July 2006, representing 30.6%.

The EEOC argues that Jones was constructively discharged by Defendants' refusal to select him for work. As discussed above with respect to Randy Johnson, a constructive discharge claim has a high standard. Jones cannot meet this standard. At most, Jones has presented evidence that he was not selected for work for a period of three weeks, and one comment was made from which he personally inferred age bias, and he witnessed younger employees being selected for work. This is insufficient to create a genuine issue of fact as to whether Jones's employment was so discriminatory that a reasonable person would have quit. There is no showing of a continuous pattern of discriminatory treatment. Indeed, courts have found that work environments that were filled with many more instances of discriminatory conduct and more severe conduct were not sufficient to create hostile work environment that would cause a reasonable

argument, not evidence. The EEOC has no evidence that this younger employee was trying to break off Jones, or that whoever was the supervisor had condoned that conduct.

6. The EEOC asserts that although Defendants stated that Jones abandoned his job as of January 7, 2004, because one of Defendants' exhibits possibly shows that Jones received a

pay raise on June 12, 2005, there is a an issue of fact as to Jones' termination date. This date discrepancy is irrelevant because Jones testified that he showed up for work for a period of three weeks before deciding to stop coming to work. Accordingly, at the latest, Jones was separated from employment in the last week of January 2004.

person to quit. *See Morgan v. City and County of San Francisco*, No. C–96–3573–VRW, 1998 WL 30013, at *8 (N.D.Cal. Jan.13, 1998) (finding that being subjected to insensitive coworker remarks such as "You don't fit in," poor performance evaluations, inaccurate reporting of sick leave and having to tell the receptionist when she left her work station did not rise to the level of a hostile work environment. "Occasional hurtful remarks by a coworker or supervisor do not reach the appropriate level of severity."); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (mere utterance of epithet which engenders offensive feelings would not affect conditions of employment to sufficiently significant degree necessary for violation of Title VII).

Moreover, although the statistics presented by Defendants as to the number of persons hired and their age may possibly be skewed or incomplete as they do not address how often employees were selected for work, the EEOC has not disputed the evidence presented. Instead, the EEOC only argues that it is irrelevant. This Court finds that the evidence is relevant because it demonstrated that older workers remained employed, from which one could infer that they were being selected for work. In addition, the EEOC has not presented any contrary evidence from which an inference of age discrimination could be made.

For these reasons, summary judgment with respect to Jones's claim is GRANTED.

### 7. *Curtis Howard*

 Curtis Howard, born 1961, was hired in June 2004 as a casual pitcher/driver at the Sloan Transfer Station. There is a dispute as to whether Howard was hired into the Roll–Off Driver department or as a pitcher in the Front Loader line of business. Attendance records indicate that Howard worked in the roll-off department at the higher driver pay rate for a few days in late June, and Howard testified that it was his understanding that he was hired as a driver. In addition, Howard possessed a Class A license, which is a higher class license than needed to drive most of the trucks.

On June 28, 2004, Howard was assigned to work as a pitcher, which has a lower rate of pay by five dollars per hour. There is also a dispute as to whether Howard again worked as a driver on July 1 and 2, 2004. Defendants state that attendance records indicate he was paid the driver rate of pay for those days, but Howard testified that he did not drive and he only worked as a pitcher/assistant.

There is a dispute as to whether Howard worked on July 3 or whether he received an excused absence for that day. On July 6, 2004, Howard spoke with Hope Graham and Romeo Vellutini of Human Resources to complain about not being assigned to work as a driver, when he had moved from California for the position. Howard testified that he was told there was no work as a driver, and that he should continue to report to work as pitcher. Howard did not report back to work. Howard was terminated on July 7, 2004, for failing to call in or report back to work for three consecutive days.

Although Howard does not dispute that he did not return to work after July 3, 2004, he states he did not do so because there was no work in the driver position for which he was hired, and for which he moved from California to accept. Howard also states that he was not supposed to report to work on July 5, 2004, because in accordance with the CBA that was the day that the Fourth of July holiday was observed, since it fell on a Sunday. Therefore, Howard argues that it could not count as a no-call/no-show. Howard fur-

ther testified that on his third day of work, the roll-off supervisor asked to see his driver's license and then told him there was no work as a driver. The EEOC asserts that because the supervisor must have known there was no work as a driver, the only reason to check Howard's license was to find out his age. Howard testified that despite what the supervisor said, he had seen postings for roll-off drivers and thus he believed there were driver positions needed.

Howard testified that he was not subjected to any age-related comments, nor did he observe that he was treated differently than younger employees.

The EEOC argues that Howard was constructively discharged because he was told there were no driving positions and he was not given a chance to drive. The EEOC has not met its burden to create a genuine issue of fact regarding a constructive discharge claim. At most, Howard reported to work several times and worked and/or got paid as a pitcher, rather than a driver, and his supervisor viewed his license, which contains his birthdate. These allegations are insufficient to show that Howard was subjected to a pattern of discriminatory conduct that would cause a reasonable person to quit.

For these reasons, summary judgment is GRANTED in favor of Defendants on Curtis Howard's claim.

### B. *Employees Allegedly Terminated for Performance/Safety Issues*

#### 1. *Vincent Marrazzo*

 Vincent Marrazzo, born 1943, worked at the Cheyenne Transfer Station as a pitcher/driver since approximately 1997. He was 53 years old at the time he was hired. Over the course of his employment, Marrazzo was written up for approximately 15 incidents of causing damage to property or failing to report damage. In 2003, Marrazzo was involved in an accident

where his truck rolled over onto its side. Marrazzo was terminated based upon the seriousness of the rollover accident. Marrazzo filed a grievance with his Union, and after an arbitration, was returned to work in November 2004.

On April 21, 2005, Marrazzo was suspended from work because he was involved in an accident which damaged private property while backing up his truck. After an investigation, Marrazzo was prohibited from operating a truck for three months. He worked as a pitcher during that time and he accepted a Letter of Commitment. The Letter of Commitment stated that "I understand that if I do not correct my unsatisfactory performance problem, I will be terminated without further warning." (Defs.' Young Decl. Ex. 46 at Ex. 12.)

Not long after returning to work as a driver, Marrazzo was involved in another accident where he damaged a privately owned vehicle while backing up his truck. Marrazzo was terminated from employment based upon this most recent accident and based upon the Letter of Commitment. Marrazzo grieved his termination with his Union. An arbitrator upheld the termination.

The EEOC attempts to establish pretext by citing to the comparators for Manuel Encinas (discussed below), stating that younger drivers with worse accidents were retained. In addition, the EEOC refers to several other younger drivers who were involved in accidents, but were not terminated. For example, Adan Cano, 40 years younger than Marrazzo, was involved in eight accidents in 15 months of employment. In addition, Phillip Shamburger, who is 23 years younger, injured two different co-workers by backing into or running over them with his truck, but he was not fired until after he injured the second co-worker. Tutankhamun Johnson, who is

35 years younger, was involved in three accidents but received no more than a warning. Jesse Flanagan, born 1972, was involved in several accidents involving property damage, but was not terminated. Nolan Burke, born 1983, hit two privately owned vehicles ("POV") in a seventh-month period, but was not terminated. Jahati Bell, who is about 34 years younger than Marrazzo, was involved in many accidents and was given a Letter of Commitment on August 2001. In October 2002, he backed into a POV. In May 2003, he received another Letter of Commitment because his truck rolled into another packed vehicle. He was promoted to a regular driver position to an AM lead man position. Yusuf Shahid, born 1969, was involved in numerous accidents, but was not terminated.

Defendants counter that none of these employees are proper comparators because they did not work as Commercial front loader drivers at the Henderson Transfer Station at the same time as Marrazzo and were not disciplined by the same supervisors. In addition, Defendants state that because the comparator drivers operate in different lines of business, such as residential and R/O, they have different types of accidents and property damage.

Defendants cite to four other employees, R. Wayne Haag, Zachary Marapo, Larry Catron, and Freddie Starkey, all of whom were over 40 years old and received discipline similar to Cano and Shamburger, and were not terminated.

Marrazzo testified that he believed he was terminated based upon his age because his direct supervisor Dennis Bennett said that Marrazzo was getting too old for the job more than once a week for a few months prior to his termination.

Given that Marrazzo's direct supervisor told him that he was getting too old to do the job close in time to his termination and the comments related to his ability to do the job, the comments are sufficient to create a genuine issue of fact regarding pretext. For these reasons, summary judgment on Marrazzo's claim is DENIED.

### 2. *Jesus Chanez*

█ Jesus Chanez was born in 1958 and was 45 years old when he was hired as a casual employee on March 16, 2004. He later was assigned to work as a Roll–Off Driver out of the Cheyenne Transfer Station, where he was supervised by Eugene Harris, who is less than two years younger than Chanez. On April 25, 2004, Chanez received a Corrective Notice based upon backing up a truck into a gate at the Treasure Island Hotel and Casino, and the gate was damaged.

On May 25, 2004, Harris signed a performance evaluation for Chanez, stating that Chanez was not performing well and did not recommend him for continued employment. Defendants sent a letter to the Union informing it that Chanez, as a casual employee, was being sent back to the Union hall, effective May 21, 2004.

Chanez testified that Harris told him that he was taking too long to complete his routes. Chanez felt that it was age-related because he was safety conscious and therefore took longer, whereas the younger employees drove without taking all the necessary safety precautions. Chanez also testified that younger employees would get lost on their routes, and therefore become slow, but that Harris did not criticize those employees. The EEOC also refers to the fact that Harris made comments to claimant Eddie Wilson such as "let's get to work, old man."

Defendants assert that Chanez cannot prove his prima facie case since he cannot establish that he was satisfactorily performing his duties. This Court agrees. Indeed, Chanez acknowledged that he was

taking too long to complete his routes. In addition, as set forth below the EEOC cannot prove an inference of discrimination or pretext because the younger comparators are not similarly situated to Chanez.

▮ Specifically, the EEOC provided the following evidence of younger casual employees who were involved in multiple accidents or more severe accidents with damage and yet were not fired after only once incident: Jensen Calavan, born 1984, backed into a wall at a residence on May 18, 2006, while working as a casual employee. On July 23, 2006, Calavan was promoted to a regular employee. In October 2006, Calavan received a warning for failing to pull more than one load for the entire shift. In February 2007, Calavan failed to set his brake, causing damage to a parked car. In September 2007, Calavan received another written warning for failing to stop properly.

Lannie Bolden, born 1984, was hired as a casual in December 2005. Bolden damaged a customer's roof on March 12, 3006. Bolden was written up for failing to strap down his roll-off container to his truck on April 20, 2006. Bolden did not strap down his roll-off container again on May 19, 2006. Bolden damaged a curb at the Paris Hotel on July 20, 2006. Bolden damaged company property on August 10, 2006. After these five incidents of damage, Bolden became a regular employee on August 18, 2006.

Johnie Martin, Jr., born 1979, was hired in June 2005. While working as a casual employee, Martin damaged another vehicle while backing up his truck. Martin thereafter became a regular employee on February 27, 2006. On March 17, 2006, Martin received a Letter of Commitment. Martin damaged a customer's gate on June 16, 2006. On December 5, 2006, Martin received a warning for receiving a speeding ticket. Martin received another

warning on July 24, 2006 for failing to clean his truck.

Mark Nieto, born 1976, was hired in November 2005. He received a write up for running over carpet. On April 18, 2006, he damaged a parked vehicle. Nieto was promoted to regular employee status on July 21, 2006.

John Lee, III, born 1973, was hired on June 16, 2006. He damaged a gate while driving the truck on July 28, 2006. Lee cased damage to private property on August 3, 2006. On November 17, 2006, Lee failed to report damages to steps. Lee backed into a fence on January 18, 2007.

Marcus Whitfield, born 1964, was hired in May 2005. He damaged a chain link fence on November 2, 2005. On November 10, 2005, he refused to service a route that had been assigned to him and he was terminated.

Defendants assert that these employees are not appropriate comparators because they were all hired more than a year after Chanez was terminated, none of them worked as Roll–Off Drivers at the Cheyenne Transfer Station, and none of them were supervised by Harris.

Instead, Defendants point out that 87 casual employees who worked at the Cheyenne Transfer Station were terminated between January 2001 to May 2006 based upon performance issues not related to attendance, accidents or specific policy violations. Of those 87 employees, 36 were over the age of 40 and 51 were under the age of 40 at the time of termination.

The EEOC has not proven that these comparators are similarly situated to Chanez. The EEOC did not produce evidence establishing that other than being a driver, the comparators were similarly situated in all material aspects. For example, there is no evidence that the comparators worked in the same line of business as Chanez,

drove the same type of vehicles or routes, were supervised by the same person, or that they worked as the same transfer station. There is nothing in the record indicating what type of license or training is needed to drive the various vehicles or what the job duties entail. Neither is there information comparing the types of vehicles.[7] In addition, each of these comparators were hired more than one year after Chanez was terminated. Merely being a driver at some point in time does not establish that these younger individuals were similarly situated to Chanez in all material respects. *See EEOC v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir.2003) ("the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances"); *Visco v. Community Health Plan*, 957 F.Supp. 381, 389 (N.D.N.Y.1997) ("in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it").

█ Finally, the one age-related comment is insufficient to create a genuine issue of fact with respect to pretext because it was made to another employee and was not tied in anyway to Chanez himself, his termination, or his ability to the job.

For these reasons, summary judgment is GRANTED with respect to Chanez's claim.

### 3. *Lorrance Wilder, Jr.*

Lorrance Wilder, Jr., born 1957, was hired as a casual pitcher/driver at the Cheyenne Transfer Station in May 2005. Wilder was terminated in December 2005 for inadequate work performance and sent back to the union hall.

Wilder was never subjected to any age-related comments. Of the 87 casual employees at the Cheyenne Transfer Station that were terminated between January 2001 and May 2006 for performance issues unrelated to attendance, accidents, or specific policy violations, 36 were over 40 years old, and 51 were under 40 years of age at the time of termination.

The EEOC argues that because no one could recall the specific performance problem that Wilder had, the reason for his termination was pretext for age discrimination. In addition, Wilder believes he was discriminated against based upon his age because he noticed that younger casual employees with less seniority would be assigned work but that he was not assigned work and was sent home.

The EEOC's argument shifts the burden of its prima facie case to Defendants. The EEOC has to prove that Wilder was adequately performing his duties. The EEOC has not done so. Accordingly, the EEOC has not met its prima facie burden that Wilder was adequately performing his duties.

█ Moreover, Wilder was hired and fired within seven months of time. Although there is no evidence as to whether the same person hired and fired Wilder, the fact that Wilder was the same age at his hiring as he was at firing counsels against an inference of age discrimination, especially where there is no evidence of a

---

**7.** This Court is not implying that all of these factors need to be present to find the employees similarly situated. This Court is merely noting that lack of evidence of being similarly situated.

pattern of firing older workers after they were hired by the human resources office. *See Coghlan v. Am. Seafoods Co. LLC,* 413 F.3d 1090, 1096 (9th Cir.2005) ("an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs"); *Diaz,* 521 F.3d at 1209 (if the employer was "biased against older workers, it presumably would not have hired Plaintiffs in the first place. The temporal proximity between each Plaintiff's hiring and layoff also makes it unlikely that age later developed as the reason for the discharges"). In addition, the EEOC has not presented evidence that Wilder was replaced by a younger employee or presented other evidence that could raise an inference of age discrimination.

For these reasons summary judgment is GRANTED in favor of Defendants on Wilder's claims.

### 4. *Manuel Encinas*

■ Manuel Encinas, born in 1958, was hired on December 17, 2001, and became a regular employee effective August 17, 2002. Encinas worked as a residential driver at the Henderson Transfer Station. On December 31, 2003, Encinas was issued a warning for causing damage to the transmission of a truck. On January 7, 2004, Encinas was involved in an accident while driving on the wrong side of the road in which the driver of the other vehicle was injured and the vehicle was damaged. Encinas received a citation from the police for driving on the wrong side of the road.

Defendants conducted an investigation and determined that the accident could have been prevented. Encinas reported that the driver of the other car failed to stop at a stop sign and hit the back of his truck. Encinas was terminated from employment based upon his involvement in the accident.

Encinas filed a grievance with his union. An arbitrator found that the termination did not violate the CBA. Encinas admits that none of his supervisors ever made age-related comments.

Between January 2001 and May 2006 only 21 drivers who worked at the Henderson Transfer Station were terminated for being involved in accidents or causing damage to property. Ten employees of the 21 terminated were over the age of 40 at the time of termination and 11 employees were under the age of 40.

The EEOC claims that younger drivers who were involved in worse accidents were not fired. Specifically, the EEOC refers to Cano and Shamburger, discussed above. Shamburger, who is eight years younger than Encinas, was involved in four accidents, including one involving personal injury to a pitcher. Cano is approximately 24 years younger than Encinas. He was involved in nine accidents in two years, including one where the police found him at fault. Despite three accidents, Cano became a regular employee on October 21, 2005. In addition, Marvin Penniston–John, born 1969 and ten years younger than Encinas, hit another car twice. Then in May 2002, Penniston–John damaged the rear tire of his truck and received a written warning. He damaged a sidewalk, and axel and a right tire on May 6, 2002. On January 28, 2003, he backed into another truck. Penniston–John rear-ended another vehicle and received a Letter of Commitment. On January 1, 2004, Penniston–John caused the drive line to be damaged, and on August 25, 2005, he hit a parked car.

Odell Henry, born 1975 and 17 years younger than Encinas, received a Letter of Commitment for rear-ending another vehicle in 2006. Courtney Hunt, born 1974, also received a Letter of Commitment.

He was also involved in an accident with another car, but did not get terminated.

Defendants ague that Encinas cannot establish that he satisfactorily performed his job duties, and that there is no evidence of pretext. Defendants assert that these younger drivers are not similarly situated to Encinas. Specifically, Shamburger and Cano were commercial front loader drivers at the Sloan Transfer Station and supervised by Mark Howski. Hunt and Henry were roll-off drivers at the Cheyenne Transfer Station.

Only Penniston–John was a residential driver at the Henderson Transfer Station. Defendants argue that Encinas's accident was more severe because he was ticketed for backing up on the wrong side of a residential street, which is illegal and resulted in a collision with a private vehicle and injured a person. Defendants further contend that the EEOC cannot establish pretext because none of Encinas's supervisors made age-related comments.

This Court finds that Penniston–John is an appropriate comparator. Although none of his accidents involved illegal conduct, he had numerous accidents involving property damage. This is sufficient to create a genuine issue of fact of whether Encinas was satisfactorily performing his duties and whether similarly situated younger employees were treated more favorably.

Therefore, Defendants' motion is DENIED with respect to Encinas's claim.

### 5. *Carlos Rasool*

▮ Carlos Rasool, born 1939, applied for a mechanic position in 2004. During his interview, the senior foreman stated to him "you're retired, weren't you 65." (EEOC Ex. 46.) Defendants did not directly address Rasool's claim based upon his interview for the mechanic position in their briefs.

Carlos Rasool was later hired, on March 8, 2004, as a driver. He was terminated on April 9, 2004, because he allegedly failed the driving test by getting lost and because he lacked proficiency in shifting gears. Rasool acknowledges that he had trouble shifting gears, but claims he eventually got used to the truck, and he was told that someone would call him. One other employee, Elmer Cruz, born 1968, was terminated for failing to pass the driving test. Cruz was 36 years old at the time.

The EEOC attempts to prove discrimination based upon evidence that Tony Struck, born 1960, may have failed his driving test, but was hired anyway.

Taking the evidence in the light most favorable to the EEOC there is a genuine issue of fact regarding the basis for the non-hire decision with respect to the mechanic position. However, the EEOC has not presented enough evidence to create a genuine issue of fact regarding the basis for termination from the driver position. There is no showing that the person who evaluated Rasool's driving techniques made an inaccurate assessment or had any age bias. Moreover, there is no evidence that Rasool satisfactorily performed his job or evidence of pretext. For these reasons, Defendants' motion is DENIED with respect to the mechanic position and GRANTED with respect to the driver position.

### 6. *Billy Taylor*

▮ Billy Taylor, born 1948, initially interviewed for a job at the Henderson Transfer Station. During that interview, the interviewer said "I'm in my 50's. I don't know if I could go out there and handle this job like that." (EEOC Ex. 52.) Taylor responded that he was accustomed to working in the heat. Taylor was not hired for that position.

Taylor then interviewed for a job at the Sloan Transfer Station. He was 53 years

old at the time. In that interview, Operations Manager Danny Ficklin allegedly stated that Taylor was "kind of old" and "up in age" and asked him if he could handle this type of job.

In June 2002, Ficklin hired Taylor as a casual pitcher/driver at the Sloan Transfer Station on a trial basis. Mr. Taylor first worked as a casual pitcher in the residential department, and then transferred to the commercial front loader department on July 16, 2002. Taylor's supervisor noted in his reviews that Taylor's work performance and job knowledge improved. Ficklin completed the last performance review, dated December 13, 2002, and recommended Taylor for continued employment.

On January 2, 2003, Ficklin terminated Taylor because he allegedly failed to meet performance standards during his probationary period, which was over the past seven months. Ficklin stated that Taylor was unable to service an entire commercial route successfully, e.g. complete the usual number of loads in a given time frame, despite having been trained and given opportunities to do so. The EEOC presented evidence that Taylor had only been allowed to work as a driver on the commercial routes on four occasions.

Although Ficklin was the person who both hired and fired Taylor within a seven-month period, taking the evidence in the light most favorable to the EEOC, given the age related comments made by Ficklin, the plan to use Taylor on a trial basis, and the fact that he seemed to be performing well prior to his termination, the EEOC has presented enough evidence to create a genuine issue of material fact of whether Taylor was terminated based upon his age. Accordingly, Defendants' motion is DENIED with respect to Taylor's claim.

### 7. Albert Lee Vassar

Albert Vassar, born 1951, was hired as a mechanic by Silver State Dis-

posal on December 5, 1986. Vassar began working at the Henderson Transfer Station when the facility opened in 2000.

On September 3, 2003, Vassar received a Letter of Commitment noting that he had failed to follow several safety rules and company procedures. The Letter of Commitment gave Vassar a choice to sign the letter or be terminated immediately. Vassar signed the discipline, but did so under protest because there was no union counsel present, and although he admitted to being late in putting on wheel chocks, he disputed that he failed to follow each rule Defendants claimed he violated.

Vassar received a verbal warning on September 30, 2003, for poor workmanship. Vassar signed the verbal warning under protest because he did not have a union representative present. Vassar received a written warning on November 26, 2003, for poor work performance for allegedly failing to properly diagnose and complete an assignment and working unnecessary overtime to do so on March 1, 2004. Vassar contests the poor work performance written warning stating that he had failed to note in his work log that he repaired a light in addition to repairing the brakes and that is why it took him more time to complete the job.

Vassar was terminated from employment the next day. Vassar and his union filed a grievance over his termination and the arbitrator upheld the termination. Vassar recalls that manager Joe Knoblock made a statement that Vassar attributed to age bias. Vassar cannot remember the words Knoblock used.

The EEOC has failed to prove its prima facie case with respect to Vassar. First, the EEOC has not established that Vassar was performing his job in a satisfactory manner. Although the EEOC contests the issuance of the disciplinary actions, some of those objections were based merely on

the fact that Vassar did not have union counsel present at the time of the discipline. The objections are not based upon whether or not Vassar actually violated the rule at issue. Moreover, although he had possibly reasonable explanations for his poor work performance, Vassar admitted to making mistakes. Finally, an arbitrator upheld Vassar's termination, thereby finding that the disciplinary actions taken against Vassar comported with the requirements of CBA and that Vassar was terminated for just cause. The EEOC has alleged only that the arbitrator may not have been neutral. Even if true, however, this cannot establish that Vassar was satisfactorily performing his duties, or that the arbitrator was somehow complicit in the alleged age bias.

Second, the EEOC has not presented evidence that Vassar was replaced by a younger employee. The EEOC cites only to the hiring of a younger mechanic September 2005, and another younger mechanic on October 27, 2005. These two mechanics were hired over a year and a half after Vassar was terminated. A year-and-a-half time lapse does not establish that Vassar was replaced by a younger employee.

For these reasons, summary judgment is GRANTED in favor of Defendants with respect to Vassar's claims.

### 8. David Suazo

David Suazo, born 1954, was hired as a driver on April 7, 2003, to work at the Sloan Transfer Station. He was 49 years old at the time. Soon thereafter, Suazo was involved in two accidents resulting in damage to company property while driving a Roll–Off Truck. Suazo admitted that the first accident on June 6, 2003, was caused by his own negligence in failing to set the parking brake. The second accident occurred on June 9, 2003, when the truck flipped over while Suazo was making a left turn. The traffic accident report indicated that excessive speed, blown right front tire, and possible load shift were contributing factors. RSSD safety department investigated the accident and determined that Suazo made an improper left turn causing the truck to roll over, doing major damage to the truck. Suazo was terminated.

Defendants counter that of the 24 casual driver/pitchers at the Sloan Transfer Station that were terminated for accidents causing damage, only seven were over the age of 40 and 17 were under 40 years of age.

The EEOC asserts that Defendants discriminated against Suazo based upon his age because other younger drivers were not fired despite the fact that they caused more damage than Suazo, and by denying Suazo light duty after the accident but offering it to younger employees. The EEOC refers to employee Jensen Calavan, born 1984, who was involved in an accident where he failed to set a brake and damaged a parked car when the truck rolled as an appropriate comparator. As argued by Defendants, however, Calavan is not a valid comparator because this accident is more akin to Suazo's first accident where he failed to set a parking brake and the truck rolled into a pole. Calavan was not involved in a moving violation accident where a truck rolled over onto its side. Thus, Calavan's misconduct was not of the same level of seriousness.

The EEOC also points to the comparators listed under Jesus Chanez. Defendants do not directly address these comparators under Suazo. However, based on Defendants' response under Chanez, each of the following employees worked as a Roll–Off driver at the Sloan Transfer Station. The comparators are as follows:

Lannie Bolden, born 1984, was hired as a casual in December 2005. Bolden dam-

aged a customer's roof on March 12, 3006. Bolden was written up for failing to strap down his roll-off container to his truck on April 20, 2006. Bolden did not strap down his roll-off container again on May 19, 2006. Bolden damaged a curb at the Paris Hotel on July 20, 2006. Bolden damaged company property on August 10, 2006. After five incidents of damage, Bolden became a regular employee on August 18, 2006.

Johnie Martin, Jr., born 1979, was hired in June 2005. While working as a casual employee, Martin damaged another vehicle while backing up his truck. Martin thereafter became a regular employee on February 27, 2006. On March 17, 2006, Martin received a Letter of Commitment. Martin damaged a customer's gate on June 16, 2006. On December 5, 2006, Martin received a warning for receiving a speeding ticket. Martin received another warning on July 24, 2006 for failing to clean his truck.

Mark Nieto, born 1976, was hired in November 2005. He received a write up for running over carpet. On April 18, 2006, he damaged a parked vehicle. Nieto was promoted to regular employee status on July 21, 2006.

John Lee, III, born 1973, was hired on June 16, 2006. He damaged a gate while driving the truck on July 28, 2006. Lee caused damage to private property on August 3, 2006. On November 17, 2006, Lee failed to report damages to steps. Lee backed into a fence on January 18, 2007.

Marcus Whitfield, born 1964, was hired in May 2005. He damaged a chain link fence on November 2, 2005. On November 10, 2005, he refused to service a route that had been assigned to him and he was terminated.

Although all of these employees were hired after Suazo was terminated, they were all Roll–Off drivers at the Sloan Transfer Station. In addition, although some of the above comparators were not involved in as serious an accident as Suazo, Bolden and Martin were involved in several accidents and yet were not terminated. Although not particularly strong evidence, this is sufficient to create a genuine issue of fact regarding pretext.

With respect to the offer of light duty, the EEOC has not presented credible evidence that younger employees involved in similarly severe accidents were offered light duty.

For these reasons, Defendants' motion with respect to Suazo's claim is DENIED.

### 9. *Keith Brown*

Keith Brown, born in 1961, was 41 years old when he was hired for the recycling line of business as a Hotel Sorter at one of the hotel/casinos on February 6, 2003. Because Brown was a new employee, he could be terminated for one incident of a no-call/no-show absence. Defendants state that Brown was a no-call/no-show on March 9, 2003, and therefore, was terminated on March 10, 2003. Brown states that he reported to work on March 9, 2003, but was sent home and was told that he was no longer needed by his supervisor, John Moore.

Brown also testified that John Moore used the term "OG," which Brown understood to mean Old Dude, in addition to meaning Original Gangster. Brown further testified that John Moore made a comment once about Brown moving slowly, and that he should use Ben–Gay for his hand. Brown testified that a supervisor named Nell said "they should have somebody younger. The older dudes move too damn slow." (EEOC Ex. 10 at 35.)

Defendants argue that "OG" is not correlated to age. This Court disagrees. There is a question of fact as to what "OG" means. The term "original" means be-

longing or pertaining to the origin or beginning of something. Thus, it is possible that it could be used in street slang to mean the oldest. In addition, www.urbandictionary.com defines "OG" as "someone who has been around, old school gangster." *See* http://www.urbandictionary.com/define.php?term=og.

Defendants next argue that even if Moore's comments directly referenced age, they are nothing more than stray remarks. This Court disagrees. The EEOC has presented enough evidence to prove a prima facie case that Brown was satisfactorily performing his duties. Taking the facts in the light most favorable to the EEOC, it has also presented enough evidence to create a genuine issue of fact as to whether Brown was terminated for legitimate reasons or as a pretext for age discrimination. Thus, Defendants' motion is DENIED.

### 10. *Dock Willie Hines*

█ Dock Hines, born 1943, was hired in 1979. In 2003, Hines was employed as a Supervisor over the Sludge drivers at the Apex facility. Hines was terminated by Alan Gaddy, General Manager of the Apex facility, on August 15, 2003.

Defendants state that Hines was terminated for performance reasons because he allowed Sludge drivers to stop working and go home after completing only three or four loads, instead of requiring them to work their entire ten-hour shift. In addition, Defendants believed that Hines was not properly monitoring the drivers and he allowed them to report non-existent problems with their trucks as excuses for not making additional loads. The work logs for the last week of July and the first two weeks in August 2003 show that not one driver completed more than four loads in a ten-hour shift.

The EEOC asserts that this reason is pretext because Hines, who was 60 years old at the time he was terminated, was replaced by younger persons who were already employed, Dave Fink, age 46, and Tom Gardner, age 39, and those younger persons did not perform better than Hines. For example, although Fink testified that drivers usually pulled five loads in one shift, the logs for September 2003, the month after Hines' termination, show that drivers continued to pull an average of only 4.07 loads per shift. Specifically, the logs show that only 36% of employees pulled more than four loads during their shift, whereas 64% pulled fewer than five loads. In addition, Fink testified that drivers worked overtime fairly frequently.

Hines testified that he was not subjected to age-related comments by Gaddy or any other employee. Hines testified that the only reason he believed he was discriminated against based upon his age was because his duties were temporarily assumed by Dave Fink and Tom Gardner, younger employees.

Defendants counter that in March 2005, Ben Canto was promoted to the sludge supervisor position, and he was 53 years old at the time.

Defendants argue that the EEOC cannot prove its prima facie case with respect to Hines. This Court agrees. The EEOC has not established that Hines was satisfactorily performing his job. First, the logs clearly show that there was a significant increase in the number of drivers pulling more than four loads. Specifically, for the three weeks prior to Hines' termination, not one driver pulled more than four loads. However, in the month following Hines' termination, 36% of the drivers pulled more than four loads. Second, it is undisputed that Hines let drivers leave prior to the end of their shift and allowed them to report non-existent problems with their vehicles.

Moreover, even if the EEOC could establish a prima facie case, there is no evidence of pretext.

For these reasons, summary judgment is GRANTED with respect to Hines's claim.

### 11. *Mid Jackson*

██ Mid Jackson, born 1943, was hired in 1977 and became a regular employee in 1980. Jackson worked as a Residential Route Supervisor at the Sloan Transfer Station when that station was opened in approximately 2000.

Bruce San Fillipo, Sloan General Manager born 1951, testified that Jackson would allow drivers that finished their routes before the end of their shift to meet in a central place and hide out, rather than assigning them to help a driver that was going to incur overtime. San Fillipo stated that he told Jackson several times to stop that practice, but that Jackson ignored his direct order. San Fillipo, therefore, decided to terminate Jackson's employment allegedly based upon his inability to conform to San Fillipo's directions. Jackson was terminated on February 14, 2003, and he was provided with six-months severance pay. He was 59 years old at the time.

Jackson testified that he was not written up or given verbal reprimands for job performance problems. The last written reprimand in his personnel file was dated 1998. In addition, the EEOC presented evidence showing that prior to San Fillipo's deposition, Defendants listed the reason for Jackson's termination as a reduction in staff. Gerald Benford testified that Jackson was a very tough supervisor, and that San Fillipo had told him that he had been trying to work with Jackson to smooth out his rough edges.

Jackson testified that he does not recall San Fillipo making comments that he believed were derogatory based on his age. However, when he was terminated, San Fillipo allegedly told Jackson that the company wanted "to go in another direction" and that Jackson did not fit in. (EEOC Ex. 26 at 39.) Jackson was replaced by Donny Redmond, born 1971, age 32 at the time.

Defendants argue that the EEOC has not established that Jackson was satisfactorily performing his job duties. Given the direct contradictory evidence produced by the EEOC which this Court must assume is the truth, and construing the evidence in the light most favorable to the EEOC, this Court finds that the EEOC has presented enough evidence to establish its prima facie case that Jackson was satisfactorily performing his job because Jackson denies being given verbal warnings and there is no evidence of the warnings other than the contradictory testimony of San Fillipo, which was given much later in time.

The EEOC first attempts to establish pretext by arguing that Jackson was adequately performing his job and did not allow drivers to hide out. For example, they discuss the number of trucks he was supervising, that there was no "sit-down" regarding exceeding budgeted overtime, that some drivers did not radio in when they finished their routes, that Jackson took measures to reduce overtime, and that he did not leave work until the last truck had returned. The EEOC also asserts that pretext is established based upon the evidence that foreman Cedric Jones, age 39 at the time, knew that some of his drivers finished early and went home without calling him, and Jones was not disciplined. In addition, in 2000, LaBruzzo stated he did not want drivers picking up other drivers' routes. All of this evidence, however, goes to the prima facie case of whether Jackson was satisfactorily performing his job and does not

establish that the true reason for termination was Jackson's age.

To the extent the EEOC is arguing that Jones is a similarly situated employee who was treated more favorably than Jackson, the EEOC has not established that he was similarly situated. At most, the EEOC has shown that Jones knew that some drivers finished early and went home without calling him. There is no evidence that Jones allowed drivers to corral and hide out. Therefore, Jones is not an appropriate comparator.

Next, the EEOC argues pretext based on the fact that San Fillipo did not fire anyone else for failing to cover routes. This argument does not establish pretext because the EEOC did not show that there was another supervisor who failed to cover routes that could have been terminated but was not.

Finally, the EEOC contends that pretext is established because Defendants stated Jackson was laid-off in their discovery responses, but later claimed he was terminated for performance reasons. In addition, when he was terminated, Jackson was told that the company wanted to go in another direction and that he did not fit in, and he was given severance pay.

■ Although an offer of a severance agreement does not itself raise an inference of pretext, *see Mundy v. Household Fin. Corp.*, 885 F.2d 542, 547 (9th Cir. 1989), "fundamentally different justifications for an employer's action would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." *Payne v. Norwest Corp.* 113 F.3d 1079, 1080 (9th Cir.1997) (citing *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir.1993)); *cf. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir.2002) (shifting reasons for discharge do not create an issue of fact regarding pretext where those reasons are not incompa-

tible). This is because varying reasons may show that the stated reason was pretextual "for one who tells the truth need not recite different versions of the supposedly same event." *Id.* While the employer's shifting explanations may be "acceptable when viewed in the context of other surrounding events .... such weighing of the evidence is for a jury, not a judge." *Id.*

Certainly, being laid off because the company wants to go in another direction is fundamentally different from being terminated based upon poor performance or insubordination. Moreover, Defendants have never alleged that there was a reduction in force and the reason they chose Jackson was based upon performance issues. Instead, Defendants told Jackson the company wanted to go in another direction, offered him severance, responded in discovery that he was laid off, but later in deposition testimony stated he was terminated for performance reasons. Accordingly, the EEOC has produced enough evidence to create a genuine issue of fact regarding pretext.

For these reasons summary judgment is DENIED with respect to Jackson's claims.

### 12. *Jimmy Hilton*

■ Jimmy Hilton, born 1947, was hired in 1975. In 2000, Hilton was employed as the Routing Manager. Defendants claim that his position was eliminated in 2000, and he was terminated by Paul LaBruzzo. President Steve Kalish testified that Hilton was terminated because the company went from a custom routing department to a software routing system, which eliminated Hilton's role in the company. The EEOC disputes that Hilton's position was eliminated because Defendants continued to have Routing Department and they did not offer Hilton training on the software. Kenny Feinberg, born

1955 and age 46 at the time, testified that he replaced Hilton and became the manager of the Routing Department.[8]

Hilton was re-hired by LaBruzzo as a Relief Route Supervisor in 2001, at the age of 54. On March 25, 2001, Hilton was given a warning regarding his performance because the company had received complaints from customers. Hilton was terminated in June 2001. LaBruzzo testified that Hilton was terminated because he did not get to work on time, and he did not check his trucks while they were on route.

Defendants argue that the EEOC cannot prove that Hilton was satisfactorily performing his duties as a Relief Route Supervisor. This Court agrees. Hilton did not contest that customer complaints were received or that he did not get to work on time or that he checked his trucks while they were on route. Indeed, the EEOC did not even attempt to establish this point and only argued pretext in its opposition. Accordingly, there is no evidence that Hilton was satisfactorily performing his duties.

Even if the EEOC could establish its prima facie case, its arguments regarding pretext do not create a genuine issue of fact. First, LaBruzzo re-hired Hilton at the age of 54, and fired Hilton months later. The Ninth Circuit has long held that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71

(9th Cir.1996); *see Diaz*, 521 F.3d at 1209 (an inference of discrimination is not warranted where the company laid off many employees "only shortly after hiring them at what were already relatively advanced ages ... If [the employer] was biased against older workers, it presumably would not have hired [the][p]laintiffs in the first place"). However, "[t]he same-actor inference is neither a mandatory presumption (on the one hand) nor a mere possible conclusion for the jury to draw (on the other). Rather, it is a 'strong inference' that a court must take into account on a summary judgment motion." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1096 (9th Cir.2005).

The EEOC attempts to rebut this strong inference by arguing that Hilton was set up to fail. The EEOC, however, presented only Hilton's testimony that the relief supervisor position was difficult because Hilton did not know each area well enough so that he could easily replace workers who were absent. This in no way establishes that Hilton was set up to fail.

The EEOC next argues that it appears that LaBruzzo's initials appear to have been fabricated on a memo regarding scorecards that Hilton allegedly failed to submit. Even if it were true that the initials were fabricated, the EEOC has not shown that the failure to fill out scorecards was the basis for Hilton's termination or that such alleged conduct by Hilton played any role in his termination.

The EEOC next argues pretext based upon a list of employees and the reasons for termination that was provided in dis-

---

8. Although the EEOC provided evidence regarding Hilton's termination in 2000, its only argument with respect to this position is that there were numerous reasons given for the termination in 2000. This Court does not find that numerous reasons were given. Although Hilton may have been told that the Routing Department was closing, which it

was not, there is no evidence that Hilton's position of custom routing was still available or that the Routing Department still performed those duties. The EEOC does not argue pretext with respect to this position. Accordingly, this Court assumes that Hilton's claims are based only upon his 2001 termination.

covery which states that Hilton was terminated on June 30, 2001 as part of a reduction in staff, rather than for poor performance. This, however, without more as was the case with Mid Jackson, does not establish pretext, especially where it is undisputed that Hilton was not satisfactorily performing his duties.

The EEOC has not offered sufficiently probative evidence that would allow a reasonable fact finder to conclude either that the alleged reason for Hilton's discharge was false, or that the true reason for his discharge was a discriminatory one.

Accordingly, Defendants' motion is GRANTED with respect to Hilton's claims.

### 13. *Nico Kelley*

Nico Kelley, born 1955, was 50 years old when he was hired by RSSD in May 2005 as a casual pitcher/driver in the residential line of business at the Sloan Transfer Station. In June 2005, Kelley worked as a Roll–Off Driver. On June 28, 2005, Route Supervisor Ray Lindsey terminated Kelley and sent him back to the Union hall because after two and a half weeks of training, Kelley was not progressing and not performing up to standards.

Between January 1, 2001 through June 2006, 34 casual employees at Sloan were terminated for poor work performance and failure to pass the probationary period. Of those 34, only 12 were over the age of 40.

Kelley testified that on the day he was terminated Lindsey told him that he was not going fast enough and that there were younger employees who went faster than him. Lindsey also allegedly said "I already got an old white guy doing what you do."

Kelley's testimony of age-related comments made by the decision-maker at the time Kelley was terminated raise a genuine issue of fact of whether Kelley was terminated based upon his age. Accordingly, Defendants' motion with respect to Kelley's claim is DENIED.

### C. *Employees Allegedly Terminated for Position Eliminations and Consolidations*

#### 1. *Eddie Williams, Robert LaRocca & William Lacy*

William Lacy was initially hired a casual pitcher by Silver State Disposal in 1973. He became a regular driver in 1974, and was later rehired in 1983. Robert LaRocca was hired as a casual pitcher by Silver State Disposal in December 1976. Eddie Williams was hired as a casual pitcher by Defendant Silver State Disposal on January 3, 2003.

In January 2003, Williams was working as the Route Supervisor for the morning AM Commercial Front Loader shift at the Cheyenne Transfer Station and his salary was $78,000 a year. LaRocca was the Route Supervisor for the evening shift and his salary was also $78,000 a year. Lacy was the Relief Route Supervisor for Williams and LaRocca, and Lacy's salary was $59,000 a year. Collectively, Williams, LaRocca, and Lacy are referred to herein as the "Route Supervisors."

In January 2003, Defendants consolidated the AM and PM Commercial Front Loader shifts into one shift starting at approximately 6:00 a.m. at both the Sloan and Cheyenne Transfer Stations. Williams, LaRocca, and Lacy were terminated from employment on January 3, 2003. Williams was 55 years old at the time, LaRocca was 56, and Lacy was 57. At the time of their termination, Lacy and LaRocca were presented with a Separation Agreement and Release of Claims (the "Separation Agreement"). The Separation Agreement included waivers of tort and statutory liability, including age discrimi-

nation claims, in exchange for severance pay.

After their termination, Chris Hannah and Cedric Deas assumed the supervisory duties of the Commercial Front Loader line of business at Cheyenne Transfer Station. Chris Hannah's date of birth is March 16, 1967, and at the time of the assumption of duties, Hannah was working as the Operations Manager for Cheyenne. Chris Deas's date of birth is December 15, 1967, and at the time of the assumption of duties had been working as a Route Supervisor for the Recycle Department.

Deas testified that he thought one of the Route Supervisors should have trained him prior to being let go. He also testified that at the time he was earning approximately $52,000 a year as Commercial Front Loader. When all of the trucks were moved to the AM shift, Hannah took over the responsibility of running the single A.M. Commercial Front Loader shift at Cheyenne, using Union member "Lead Men" to assist him after Deas elected to return to driving a truck.

Paul LaBruzzo made the decision to eliminate the three Cheyenne Front Loader Supervisor positions. Neither LaRocca, Williams, nor Lacy ever heard LaBruzzo make derogatory comments based on age.

Two days after terminating the three Route Supervisors, on January 5, 2003, Defendants ran an advertisement in the Las Vegas Review Journal, the local daily newspaper, for the Route Supervisor positions. Defendants ran additional advertisements in the newspaper for the positions on January 6, 19, and 22, 2003.

Lacy and LaRocca state that they would have considered a salary reduction rather than losing their jobs. LaRocca had, prior to 2000, previously accepted a salary reduction at Defendants' request.

Defendants state that they decided to eliminate the positions of the three Chey-enne Front Loader Supervisors, and to use only one or two supervisors and Union member "Lead Men" as part of the consolidation of the A.M. and P.M. shifts and to reduce costs.

Plaintiffs Lacy and LaRocca filed an opposition to the instant summary judgment motion on July 29, 2008. (Doc. # 213.) In their opposition, Plaintiffs Lacy and LaRocca included a declaration from Gerald Benford, among other exhibits. Benford was previously employed by Defendants as the general manager of labor relations and human resources, and was responsible for responding to the EEOC regarding the facts of this case. Benford states that "salary considerations or payroll limits never were expressed or implied in any of the discussions pertaining to the terminations of the route supervisors. [His] entire understanding of reasons for the shift consolidation ostensibly related to reducing liability as a result of curtailing night driving." (Benford Decl. ¶ 7.)

On August 12, 2008, Defendants filed a Motion to Strike New Portions of Plaintiffs Lacy's and LaRocca's Opposition to Defendants' Motion for Summary Judgment and Declaration of Gerald Benford. (Doc. # 225.) Lacy and LaRocca filed an opposition to the motion to strike on August 15, 2008. Defendants filed a reply on August 29, 2008. Defendants point out that in their initial motion for summary judgment filed September 10, 2007, they stated as follows "The decision to use only one or two supervisors (Chris Hannah and Cedric Deas) and Union member 'Lead Men' to oversee the consolidated Commercial Front Loader shift was essentially a financial decision to reduce costs." Lacy and LaRocca responded in their original statement of Undisputed Facts that this statement was undisputed. Defendants argue that Benford's declaration should be

stricken because this Court allowed refiling of oppositions to the summary judgment motion only for purposes of addressing the revised dates of birth. Defendants state that this Court did not give Lacy and LaRocca free reign to significantly alter their previous statement of facts.

Lacy and LaRocca argue that this Court should consider the declaration in order to make a reasoned decision on the merits of the summary judgment motion. Lacy and LaRocca further argue that Defendants have not claimed that they have been prejudiced by a failure to provide responsive evidence.

This Court denies Defendants' motion to strike because Plaintiffs Lacy and LaRocca have not changed the substance of their argument by including the Benford Declaration. Specifically, the wording of the previous undisputed factual statement stated that the decision to eliminate the positions was "essentially a financial decision to reduce costs." The use of the word "essentially" implies that there were other reasons for the elimination of the positions. Accordingly, not disputing that financial considerations may have been involved, does not mean that it is undisputed that age was not a motivating factor in the decision or that financial considerations was a pretext for age discrimination. Moreover, Benford states only that reducing costs was not a part of the discussions he was involved in. Accordingly, Defendants' motion to strike is denied and this Court will consider the Benford Declaration.

▆▆ Here, it is undisputed that Williams, Lacy, and LaRocca meet the factors of their prima facie case of age discrimination since they are members of a protected class, were performing their jobs in a satisfactory manner, were discharged, and Defendants had a continuing need for their skills and services in that their various duties were still being performed by Hannah and Deas, and they ran advertisements for Route Supervisor positions.

Defendants state that they have presented a legitimate reason for the elimination of the three Route Supervisor positions: a financial decision to reduce costs. Defendants claim that there is no disputing that the P.M. shift, which LaRocca previously supervised, was eliminated and that Lacy's Relief Route Supervisor position was eliminated. Defendants also claim that Plaintiffs have not shown that the advertisements were for the Route Supervisor positions in the Commercial Front Loader line of business, rather than the Recycle or Residential line of business.

The problem with Defendants' argument is although no employee currently holds the title of Route Supervisor for the Commercial Front Loader line of business, Plaintiffs have presented enough evidence to create a genuine issue of fact as to whether the alleged legitimate reason was a pretext for age discrimination. Specifically, all A.M. Route Supervisor duties are being performed by one or two much younger employees. Defendants have not shown why Lacy, LaRocca, and Williams were selected for layoff, rather than reconfiguring job duties and offering them, rather than Hannah and Deas, the newly defined position at a lower salary. Moreover, even if it is true that Hannah and Deas combined earn less than Williams, Lacy, and LaRocca combined, Defendants have not addressed the extra overtime pay paid to the Union Lead Men, who assist Hannah and Deas. Accordingly, it is unclear whether Defendants' costs have actually been reduced or they could have believed would have been reduced at the time the decision was made.

Finally, Defendants are in the best position to know what job position was intended to be filled through the advertisements. On their face, the advertisements are not

clear as to which line of business. Moreover, even if the advertisements were run to fill Route Supervisor positions in a line of business other than Commercial Front Loader line, Defendants have admitted that Deas was already the Route Supervisor for Recycle when he was asked to assume the Commercial Front Loader Route Supervisor duties. Defendants have not provided a reason why Deas's position was not eliminated and Lacy, LaRocca, or Williams asked to assume Deas's duties. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir.2008) ("[w]here a reduction in force is involved, the employer must not only explain the reasons for the reduction in force, but must also explain why each particular plaintiff was selected to be laid off").

For these reasons, Plaintiffs Williams, Lacy, and LaRocca have created a genuine issue of fact of whether they were terminated on the basis of their age. Defendants' motion is DENIED with respect to Lacy, LaRocca, and Williams' claims.

### 2. *Clayton Hickman*

Clay Hickman, born 1947, was hired in April 1992, and was later promoted to the position of office manager. His duties included preparing work schedules for office staff, reviewing truck tonnage reports, ordering office supplies, customer service, and payroll. Defendants allege that in the end of 2002, after evaluating the administrative work force at the Cheyenne Transfer Station, General Manger of that station, Paul LaBruzzo, determined that Hickman did not have a full days worth of work to do. LaBruzzo stated he set out to consolidate positions because he did not want two positions, each having only a half of a days work. Hickman was terminated in January 2003. Hickman was 55 years old at the time of his termination.

Defendants state that Hickman's position was consolidated with LaBruzzo's executive assistant, Rhonda Walters', duties and she assumed Hickman's former duties.

The EEOC contests the determination that Hickman did not have a full days of work to do, because after taking over Hickman's job, LaBruzzo let Walters work overtime so that she could learn the officer manager position. In addition Walters had no prior experience working as a supervisor or experience with payroll and the timekeeping system. Walters testified that it took her several months to one year to learn all of her duties well. The EEOC also disputes that Walters performed Hickman's job in addition to her regular duties. Instead, Walters, who was 37 years old at the time, was promoted to the office manager position. In addition, Walters testified that two years after Hickman was terminated, she performed only some of her former secretarial duties and other duties were given to other departments.

The EEOC states that Hickman asked if he could be demoted, and LaBruzzo responded no. Hickman asked if the officer managers at the other transfer stations were being terminated and LaBruzzo told him they were, even though they were not.

Before Hickman was terminated he was teaching Joe LaBruzzo, Paul's brother, some of the office manager duties and Joe LaBruzzo was acting as co-manager at the Cheyenne Transfer Station. Joe LaBruzzo, born 1958, and 11 years younger than Hickman, was later transferred to the officer manager position at the Sloan Transfer Station. Latondia Coleman, born 1968, was 21 years younger and worked as the Henderson Transfer Station manager. Neither of these employees were terminated.

Hickman admitted that LaBruzzo never directed age-related comments to him or other employees and at the time of his

termination and he did not believe that he was terminated because of his age.

Defendants argue that Hickman cannot establish that he was replaced by a younger employee, since his duties were assumed by others. The EEOC, however, has provided enough evidence to show that Defendants had a continuing need for Hickman's skills and services in that his duties were still being performed by a younger employee, Walters. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir.1996) (employee did not have to show that he was directly replaced by a younger employee "it is enough that [his] duties were substantially transferred" to a younger employee). Thus, the EEOC has met the prima facie case.

Defendants argue that the consolidation of duties to achieve efficiency and save costs is a legitimate non-discriminatory reason for termination. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 892 (9th Cir. 1994) (the decision to decentralize the human resources function and have duties assumed by others is a legitimate, nondiscriminatory reason for a termination). Defendants, however, have no evidence to support their allegation that they consolidated positions to reduce payroll.

Defendants argue that the EEOC's position that Walters should have been terminated rather than Hickman is a simple disagreement with respect to the decision and does not show that Hickman was terminated based upon his age. This Court disagrees because Defendants provide no reason why when deciding to consolidate positions, they did not terminate Walters' position, rather than incurring months of overtime training her to be promoted to Hickman's position. In other words, Defendants have not explained why Hickman was selected for termination.

"As workers age, their marginal productivity may fall and the costs of retaining them may rise, whether through higher benefits costs or the higher salaries they've earned. As a result, employers might think that younger workers can do the same work as older workers at a lower price, whether measured in time or money. Giving effect to these assumptions by swapping the older with the younger worker would be an act of age discrimination." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1065 (7th Cir.2008) (citing *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 586–87, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004) and *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

As Defendants have failed to provide a legitimate reason for selecting Hickman in particular over Walters when consolidating the two positions, this Court need not engage in an analysis of pretext. For these reasons, Hickman's claims survive summary judgment and Defendants' motion is DENIED.

### 3. *James Cornell*

■ James Cornell, born 1944, was hired in 1980 as a public relations representative and he worked in the administrative offices. In 1981, he became the building manager and he was responsible for ordering office supplies, janitorial services, general building maintenance, and sorting and distributing company mail. Cornell's employment was terminated on January 3, 2003, and he was told it was due to company downsizing. President Steve Kalish testified that Cornell's only responsibilities at the time were to take care of the mail, but the company changed its mail system and therefore Cornell's position was eliminated. Cornell was 58 years old at the time.

Cornell's duties were reassigned to Ron Mauro, born 1942, and Greg Caldwell, born 1953. Mauro had previously performed Cornell's duties when Cornell was

ill or on vacation. No one was hired to replace Cornell.

Cornell testified that he knew President Steve Kalish since he started working there in 1980, but that in the last five years of his employment, Kalish referred to him several times as "old man." Specifically, Kalish would say "Hi, Old Man," or if he needed something right away he would say, "Come on, Old Man, get it done."

As discussed elsewhere in this order, the use of the term "old man" while in passing and unrelated to the elimination of the position is a stray remark, insufficient to prove discrimination by direct evidence. Accordingly, the EEOC must proceed through the burden shifting framework.

The EEOC, however, cannot establish that Cornell was replaced by a younger employee. The person who assumed the majority of his duties was two years older than him.

The EEOC next argues that it can establish an inference of discrimination and pretext based on alleged shifting reasons for Cornell's termination. The EEOC states that Kalish testified that Cornell's position was terminated because of the change in the mail system, yet Kalish did not know who made the decision to change the mail system. In addition, the HR Director Benford testified that the building manager position was eliminated. The EEOC's argument lacks merit because the reasons given by Defendants for Cornell's termination are not inconsistent. *See Nidds*, 113 F.3d 912, 918 (9th Cir.1996) (where the reasons given are not incompatible they do not raise an issue of fact with respect to pretext). Both Kalish and Benford consistently testified that Cornell's position was eliminated. Moreover the EEOC has not disputed that sorting the mail was a primary duty for Cornell, that it took up a lot of his time, and that the mail system was changed.

In addition, the EEOC has not shown that Kalish's calling Cornell an old man were tied directly to the elimination of prior mail system or to Cornell's termination. The use of the term old man in passing, with no indication as to when they were made, does not establish that Cornell's position was not eliminated, or that the reason provided is not worthy of credence. For these reasons, Defendants' motion with respect to Cornell's claim is GRANTED.

4. *Sharon Derengowski; Timothy Gittus, Kevin Stockton and Bernard Lucido*

In 1997 when Republic Industries purchased Silver State Disposal, the Data Processing department consisted of Manager Bernie Lucido, born in 1952, Timothy Gittus, born in 1956, Kevin Stockton, born 1960, Sharon Derengowski, born 1950, and three other people. Derengowski was Lucido's administrative assistant. At that time, RSSD had custom software programs for billing, payroll, accounting and other functions, which were written, maintained and modified by the programmers and run off a local UNISYS server.

The department became known as the Information Technology ("IT") department. Over time RSSD replaced at least some of the custom software programs, which Lucido, Gittus, and Stockton worked on and maintained, with standardized programs that were used by all other RSI subsidiaries.

On January 3, 2003, IT positions were eliminated and Gittus, Stockton, and Derengowski were terminated. Tim Gittus was 46 years old at the time he was terminated, Kevin Stockton was 42, and Sharon Derengowski was 52 years old. Lucido was terminated in June 2003. He was 50 years old at the time. Employees remaining in the department were Eric Stewart,

age 33 at the time, Frank Billotti, age 41 at the time, and Randy Larson, age 48 at the time.

Defendants state that the positions were eliminated because the custom software and local server were replaced in favor of outside services or standardized software run off a server in Florida, and administered by employees in Florida. No new persons were hired to fill the eliminated positions.

 Gittus testified that 100% of his responsibilities involved payroll, and that before his position was eliminated RSSD outsourced its payroll function to ADP, which had the effect of transferring approximately 40% of his duties to ADP. Lucido testified that the switch to ADP was done in 1999 or 2000. In addition, Gittus testified that RSSD started using a different software program for billing and he no longer supported that system, and Randy Larson supported the new software. Lucido testified that the switch occurred in September 2002, and there was no longer a need to write code or maintain any custom billing software run off the UNISYS system.

It is clear from the record that all of Gittus's duties were outsourced to ADP or subsumed by the standardized software and he was not replaced. Thus, the EEOC has failed to prove its prima facie case with respect to Gittus. The EEOC has failed to provide any evidence that could create a genuine issue of fact that the reason Gittus's position was eliminated was a pretext for age discrimination.

 Derengowski was responsible for installing terminals, PCs, printers, inventory, and assisting employees on their PCs. In 2002, she became the Sofpak administrator. Defendants customized Sofpak and renamed it RSI. Derengowski was trained in RSI a few months prior to her termination. The EEOC asserts that after Derengowski was terminated, her duties

were assumed by Billotti, who was 11 years younger than her, and Larson, who was four years younger than her.

The evidence does not support the EEOC's assertion that Derengowski's duties were assumed by Billotti. Stewart testified only to Billotti's current functions as of the time of his deposition and that Billotti's duties remained the same as they were before Derengowski's termination.

With respect to Larson, Derengowski testified that he told her that his job was changed from programmer to RSI administrator and he received training for that job. The EEOC presented evidence that Larson made $34 an hour, whereas Derengowski made only $18.70 and hour. Defendants assert that the higher salary reflects Larson's skills as a computer programmer, which he could use to adapt RSI applications, and that Derengowski did not have such skills. The EEOC presented evidence that Larson was told to pass more of his work to Lynn. In 2003, there was no employee named Lynn in the IT department.

Defendants argue that even if Larson took over Derengowski's duties, the age difference between them is only four years, which is insufficient to create an inference of age discrimination. Regardless, the EEOC has presented sufficient evidence to create a genuine issue of fact of whether Derengowski's skills and position was still necessary, whether she was replaced by Larson and Lynn, and whether Lynn is younger than Derengowski.

With respect to Lucido, the EEOC presented evidence that approximately one year after Lucido was terminated, Eric Stewart became IT manager. Defendants argue that although it is true that Stewart became a manager, it was not the same position held by Lucido because Lucido had six people who reported to him, whereas by the time Stewart became man-

ager, there were only two people reporting to him, and Lucido's efforts focused on writing custom programs.

The EEOC has presented enough evidence to create a genuine issue of fact as to whether Defendants' reasons for termination of Lucido were pretext since Defendants have not explained why Stewart was better suited for the managerial position than Lucido, or why Lucido was selected for lay off rather than Steward.

With respect to Stockton, the EEOC presented evidence that Stewart used Stockton as an independent contractor several times over the next three years, each time for several months, to complete or fix problems with the custom software and programs that he had created and to create other custom programs. In addition, there is conflicting testimony as to when the UNISYS server stopped being used, whether that occurred two weeks before the January 2003 terminations, or sometime after June 2003.

The EEOC has presented enough evidence to create a genuine issue of fact as to whether Defendants' reasons for termination of Stockton were pretext since Defendants have not presented evidence to support their assertion that employees in Florida performed the IT services or that they used outside services to perform the services that Stockton performed. Defendants' statement that the customized software was completely replaced with standardized software is belied by the fact that Stockton was hired as an independent contractor to complete and fix customized programs he had created. In addition, Defendants have not provided a reason for selecting Stockton in particular for lay off.

For these reasons, the summary judgment motion is GRANTED with respect to Gittus, and DENIED with respect to Derengowski, Stockton and Lucido.

### 5. *Jon Krieger*

Jon Krieger, born 1940, was hired by RSSD on November 6, 1985. In 2004, Krieger worked as a Paint Shop foreman at the Cheyenne Transfer Station. In approximately June 2004, Cheyenne General Manager Paul LaBruzzo decided that the duties of the Paint Shop supervisor, the Container Shop supervisor, and Compactor Shop supervisor could be condensed into one or two supervisory positions covering all three shops. The other two shop supervisors at the time were Container Shop supervisor Armando Teijeiro, born in 1967, and Compactor Shop supervisor Craig Milburn, born in 1963.

In deciding which position(s) to eliminate, LaBruzzo considered the salaries of the three individuals, and who had the better managerial and people skills, and fewer complaints in their departments. During this period it was decided that Teijeiro would go back to being a welder in the Container Shop.[9]

LaBruzzo testified that he believed that Craig Milburn had the better qualities in terms of being a manager and Teijeiro was a far second. LaBruzzo also testified that the decision was ultimately made based upon who had the higher salary. LaBruzzo testified that the plan was to terminate Krieger and his duties would be absorbed by Milburn.

Krieger was not given an opportunity to transfer to a different position. Krieger was 64 years old when his position was eliminated.[10] Teijeiro was 37 years old

---

**9.** It is disputed whether or not Teijeiro requested to be moved back to a welder position.

**10.** Defendants assert that Krieger had led others to believe that he was ready to retire. These allegations, however, were not connected to the reason for eliminating his position. In other words, Defendants have not claimed that the reason he was terminated was because he was going to retire soon anyway.

and Milburn was 41 years old at the time the decisions were made.

The EEOC argues that it can establish pretext because Milburn in fact had the highest salary of the three supervisors. The EEOC calculated Milburn's salary to be $1,465.35 per week, whereas Krieger earned $1,118 per week, and Teijeiro earned $1,120 per week. However, according to the details from EEOC's own calculations set forth in their brief, the annual salary for Krieger was $58,136, $58,240 for Teijeiro, and $58,614 for Milburn. Therefore, the EEOC has not presented evidence that Milburn in fact earned a significantly higher salary than Krieger. Instead, it appears to be a difference of approximately $500 annually. Moreover, the EEOC has not challenged LaBruzzo's determination that Milburn had the fewest complaints.

The EEOC also presented evidence of age-related comments. Those comments, however, were made by a former supervisor, who was older than Krieger and who was not involved in the decision to eliminate Krieger's position. Thus, the EEOC has not connected this evidence to Krieger's termination.

Accordingly, the EEOC has not presented enough evidence to create a genuine issue of fact regarding pretext. Therefore, the summary judgment motion is GRANTED with respect to Krieger.

### 6. *Michael Miller*

 Michael Miller, born 1938, was hired as a field agent in 1984. He was supervised by Steve Kalish until 2000. Miller was terminated on January 3, 2003. He was 65 years old at the time. Miller believes his termination was based upon his age because others in their 30s and 40s who performed the same job were not fired.

Defendants assert in their motion that Miller was terminated due to downsizing when RSSD reduced its number of field representatives and transferred many of the duties to the customer service department. Miller testified that he was told the reason for eliminating his position was that the company was downsizing at the direction of the parent company in Florida, RSI. Defendants have not submitted evidence of the reason for termination.[11]

Two months prior to Miller's termination, on November 2, 2002, Defendants hired Ms. Richards, born 1970. Two months after Miller was terminated, on March 18, 2003, Defendants hired Philip Tremblay, born 1980.

Benford testified that Miller's then supervisor, Cheryl Martello, made the decision to eliminate Miller's position. However, Benford also testified that Kalish made the decision.

Miller testified that President Kalish often called to him and referred to him as "old man," or "grey-haired old fart," but that "old man" was Kalish's favorite term. (EEOC Ex. 45 at 35.)

Taking the evidence in the light most favorable to the EEOC, the EEOC has established a genuine issue of fact regarding whether the alleged legitimate reason for terminating Miller's position was a pretext for age discrimination. Indeed, Defendants have not provided a reason why Miller was selected for termination rather than any of the other younger employees who held his same position. Accordingly, Defendants' summary judgment motion is DENIED with respect to Miller's claims.

---

11. In their brief, Defendants state that Benford testified that the position was eliminated. Benford, however, did not provide the explanation stated in the brief in the portion of his deposition cited by Defendants.

### D. Employees who Allegedly Resigned or Were Terminated for Other Reasons

#### 1. Elmo Walker

▆▆ Elmo Walker, born 1941, was hired as a pitcher/driver in 1970. In 2000 or 2001 Walker worked as the Commercial Front Loader PM Route Supervisor at the Sloan Transfer Station, until RSSD consolidated the AM and PM shifts, and Walker became the supervisor of the consolidated day shift.

In 2003, Walker told Director of Labor Relations Gerald Benford that he was going to retire. Walker told others he was leaving. Walker was approximately 62 years old. Walker believes that he was set up to fail because combining the AM and PM shifts required him to work 2 to 3 hours extra each day, increased his responsibilities, and caused a tenfold increase in customer complaints. Sean White, who covered for Walker when Walker was on vacation, believed that Walker was pushed out.

Defendant threw Walker a retirement party and Kalish gave him a special note commemorating his time with the company. After Walker left the company, White, age 35, and Marvin McCullah, age 38, performed as leadmen and Danny Ficklin, age 41, assisted them by taking care of budgeting and employee discipline. The EEOC asserts that this shows that three younger people performed Walker's duties. The EEOC also asserts that forcing Walker out was not a sound financial decision because the three younger employees who were allegedly performing Walker's duties combined, earned more than Walker, yet were less experienced.

Walker testified that Steve Kalish, President of all operations in southern Nevada, sometimes joked with him about his age, and also said "[w]hen are you going to get your old ass out of here." (EEOC Ex. 58.)

Here, the EEOC has not provided sufficient evidence to create a genuine issue of fact regarding constructive discharge. The evidence provided does not show that additional responsibilities taken on by Walker were a result of discrimination or that the AM and PM shift were consolidated to set Walker up for failure based upon his age. The evidence submitted is insufficient to create a question as to whether the working environment was so intolerable that Walker's resignation was a fitting response, neither does it show a pattern of discrimination. See Pickens v. Astrue, No. 06–35325, 2007 WL 3225465, at *2 (9th Cir.2007) ("None of the acts upon which Pickens relies left early retirement as the only reasonable alternative.").

At most, the EEOC established that the consolidation of the AM and PM shift resulted in more responsibilities and longer working hours for Walker. There is no evidence connecting this business decision to Walker's age or establishing that it was so intolerable and discriminatory that a reasonable person would have retired. For these reasons, summary judgment is GRANTED in favor of Defendant with respect to Walker.

#### 2. Jessie Williams

Jessie Williams, born 1946, was hired by Silver State Disposal in 1974 as a pitcher/driver and he soon thereafter became a driver. After ten years he was promoted to a Route Supervisor. In 2000, Williams became the Residential Route Supervisor at the new Henderson Transfer Station. In 2002, General Manager Joe Knoblock informed Williams that the company would become more computerized. Knoblock was concerned because he knew Williams could not read and write. Knoblock offered to send Williams to school and Williams was receptive at the time.

Williams was separated from employment on January 3, 2003. He was 56 years old at the time. Knoblock states that several weeks after the conversation he had with Williams about going to school, Williams told him he wanted to retire. Williams testified that approximately six months before he was terminated, President Kalish said at a foreman's meeting that "old Uncle Toms' like Haywood" would not be working for the company anymore. (EEOC Ex. 62 at 58.) Williams also testified that prior to the termination meeting with Knoblock, Knoblock stated that the company needed to hire younger people with fresh and new ideas and that the people from RSI in Florida would be "cleaning house." (*Id.* at 41.) Knoblock presented Williams with a Severance Agreement, and stated he should accept the severance pay, keep his pride, and tell everyone that he retired. Knoblock also allegedly told Williams that if he signed the Severance Agreement, he could work seven or eight more months, but after signing the agreement Knoblock told Williams that there was no use in coming in the next day. Williams testified that he was surprised he was being terminated. Williams believes that he was terminated from employment and that his relative lack of education was not a problem as he was able to perform the job for close to 30 years and Knoblock had chosen Williams to go to the Henderson Transfer Station.

Although Defendants may have had a legitimate reason for terminating Williams' employment based upon its modernization and Williams' inability to read, given the age-related comments made by Knoblock close in time to Williams' termination, summary judgment in favor of Defendant is inappropriate. The EEOC has provided enough evidence to raise a question of fact of an inference of age discrimination. *See*

*Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438 (9th Cir.1990) ("Comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim.") (citations omitted). Accordingly, Defendants' motion is DENIED with respect to Jessie Williams.

### 3. *William Adams*

■ William Adams was 57 years old when he began working in December 2002 for RSSD as a casual pitcher out of the Henderson Transfer Station. In April 2003, Adams began working as a sludge driver out the Apex location.[12] On August 24, 2003, Adams became a regular employee. Adams received several write-ups over the next ten months, for what the EEOC claims were insignificant issues.

On or about December 4, 2004, Adams received corrective notices for failure to tighten the locks on this tailgate, which allowed the tailgate to open and led to a spill of sludge, failing to report a load spill that allegedly occurred on Las Vegas Boulevard to his supervisor, and failing to report damage to the right side of trailer. Adams denied that he spilled the sludge, and denied that there was any damage to be reported. Adams objected to the discipline, and when he asked to the see the spill or damage he was told that the spill had already been cleaned up and the damage had been repaired.

Adams signed a "Letter of Commitment," which was dated December 9, 2004. Adams was compelled to sign the letter if he wished to continue his employment for the company. If he did not sign the letter, he would have been terminated at that time. The letter acknowledged the December 4, 2004 corrective notices set forth above, and included Adams' failure to doc-

---

**12.** Adams worked for a short period in August or September 2003 as a roll-off driver.

ument the reasons for not completing five loads within his ten-hour shift. Adams asserts that five loads could not be completed in a ten-hour shift because he was told to keep overtime to a minimum, and General Manager Alan Gaddy testified that at the time Adams was terminated, employees generally completed four loads during their regular hours and those who completed five loads were generally paid overtime.

On December 13, 2004, Adams submitted a resignation letter to his supervisor David Fink, making his resignation effective December 25, 2004.

Adams testified that prior to receiving the write-ups, Fink had told him that a new management program was in effect and that they were "getting rid of a lot of the older people who were making $70,000 and did not even have a GED." (EEOC Ex. 2 at 75.) In addition, a man named Curtis who worked on front end loaders also told Adams that he believed the company was trying to get rid of older workers with high salaries and little education. Finally, Adams testified that when he worked at Henderson and was assigned to work with younger people, Calvin Francis, the Operations Manager, told one of the younger workers to "break him off." According to Adams, this phrase meant to work the older workers hard or give them jobs they were unable to do.

The EEOC argues that Adams was constructively discharged based upon being written up for insignificant issues, which seemed excessive in comparison to younger drivers who caused significant accidents and damage, the Letter of Commitment was questionable, and based upon the comments made to him. Defendants argue that Adams cannot establish his constructive discharge claim based upon the alleged age-related comments because Adams was neither a higher paid employee or a management employee.

This Court finds that Adams cannot meet the high burden required to survive summary judgment on a constructive discharge claim. First, Adams was hired at an advanced age of 57 years old. Second, Adams has not shown that his discipline was unwarranted or unfair compared to others. Indeed, Adams does not even name specific comparators who were treated better, or who were not disciplined for engaging in the same alleged insignificant misconduct. Instead, he merely vaguely references younger drivers. Moreover, Adams has not denied that he actually engaged in the misconduct that led to the discipline for the alleged insignificant issues.

Adams has only contested the sludge spill and his ability to complete five loads and keep overtime to a minimum. With respect to the sludge spill, however, Adams has not produced any evidence that the sludge spill did not occur, that it was unreasonable for Defendants to believe that the sludge spill occurred, or that it was unfair to require him to enter into a Letter of Commitment based upon the sludge spill accident. Courts have consistently held that they should not second guess an employer's exercise of its business judgment in making personnel decisions, as long as they are not discriminatory. Therefore, an employer's belief that the employee's performance was unsatisfactory, even if mistaken, is not grounds for inferring discrimination. See Russell v. Placeware, Inc., No. Civ. 03–836–MO, 2004 WL 2359971, at *10 (D.Or. Oct.15, 2004) ("the Ninth Circuit has warned courts to be careful not to punish employers for making valid business decisions") (citation omitted); Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125 (7th Cir.1994) ("The mere submission of materials from a co-worker or supervisor indicating that an employee's performance is

satisfactory, or more specifically that an employee's performance is satisfactory because he was not entirely responsible for several admitted mishaps, does not create a material issue of fact."); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) (where there was no evidence of a basis for doubting sincerity at the time of an articulated motivating reason for an employment action, the reason was not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment); *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 986 (10th Cir.1996) (employment laws not violated by erroneous or illogical business judgment); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988) ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons."); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991) ("Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions."); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

Because there is no evidence showing that it was unreasonable for Defendants to believe the sludge spill occurred and to discipline Adams for that act, Adams has not established that the Letter of Commitment was unwarranted and therefore a part of a pattern of discrimination.

Finally, the one comment by the supervisor which did not pertain to Adams in particular could not reasonably create a work environment so hostile that a person would feel compelled to quit. Therefore, this Court GRANTS Defendants' summary judgment motion with respect to Adams' claims.

### 4. Louis "Buster" Thomas

■ Louis Thomas, born 1947, was hired in 1987. In 2005, he was working as a Commercial Front Loader driver at the Cheyenne Transfer Station. Thomas injured his left shoulder and lower back while working on January 17, 2005. He filed a worker's compensation claim. Thomas had surgery on his left shoulder on February 16, 2005. Thomas worked in a modified duty position for a few months. During that time, General Manager Joseph Knoblock asked Thomas to pick up paper. Thomas believed that picking up paper would break the light duty restrictions that his doctor had placed upon him and that Knoblock made this request as a means to get rid of older employees.

Thomas testified that Chris Hannah told him and others that all the old guys would be replaced with younger employees at the direction of higher management. The EEOC also points to a comment made by Knoblock two years earlier that the company needed to hire younger people with fresh and new ideas.

In late April 2005, Thomas took a Functional Capacity Evaluation. The evaluator concluded that Thomas could only perform sedentary work. The evaluator stated that she was unable to complete testing due to Thomas's heart rate and blood pressure. The evaluator found that Thomas "does not meet his pre-injury occupation as a Driver ... as this falls into the heavy physical demand level which he is not safe to perform at this time." (Defs.' Young Decl. Ex. 54 at Ex. 3.) It is undisputed that Thomas has been unable to work as a driver due to his shoulder injury.

Defendants' Personnel Action Form indicates that Thomas was separated from

employment on May 20, 2005, and he was referred to vocational rehabilitation. On July 15, 2005, Thomas accepted a lump sum payment of $15,000 in lieu of vocational rehabilitation. Thomas agreed that he did not wish to return to any employment with Defendants and that he agreed to voluntarily resign his employment, effective the date he received the lump sum payment.

Between January 2001 and May 2006, 99 employees ended their employment by accepting vocational rehabilitation services or choosing a buyout. Of the 99 employees, 38 were over the age of 40 and 61 were less than 40 years of age.

Thomas alleges that he was being pushed out of employment through the workers' compensation scheme, like Michael Barnes, who is discussed below. The EEOC, however, has failed to create a genuine issue of fact regarding age discrimination. First, the EEOC asserts that Thomas was discriminated against based upon his age because Defendants hired younger employees with blood pressure problems, and gave them an opportunity to re-take the physical exam after resting for a period of time. It is undisputed, however, that each of these younger individuals had a slower heart rate than Thomas. Furthermore, even if Thomas had passed the blood pressure and heart rate conditions, it is undisputed that Thomas's shoulder injury prevented him from working as a driver. Thomas did not show that any of these younger employees have injuries that prevent them from working as a driver.

Moreover, although Thomas believed that Knoblock tried to make him break his light duty restrictions, Thomas has not shown that being asked to pick up paper was a violation of his light duty restriction. Finally, the EEOC has not provided evidence of an available job that Thomas could have performed. For these reasons,

summary judgment is GRANTED with respect to Thomas's claims.

### 5. *Michael Barnes*

■ Michael Barnes, born in 1963, was hired in 1995. He was employed as a driver/pitcher for the Commercial Rear Loader line of business at the Cheyenne Transfer Station when he injured his shoulder, back and right knee on June 3, 2004, while lifting a trash can. Barnes was 41 years old at the time. Barnes went off of work the next day.

Barnes was evaluated by Dr. Robert Braden. Dr. Braden found that Barnes had severe to marked hip osteoarthritis and due to extreme loss of motion in the hip joint area, his lower spine was placed in a significant compensatory state. Dr. Braden told Barnes that his deteriorating hips would progress rapidly due to the nature of his job as a pitcher/driver and he would need a hip replacement at an early age. Dr. Braden recommended that Barnes engage in another type of job because he was in serious jeopardy of further injury to his spine. On June 14, 2004, Dr. Braden released Barnes for work on restricted/modified duty.

Barnes' termination date was noted as June 14, 2004, and he did not return to work. Instead, Romeo Vellutini, the workers' compensation administrator, called Barnes and told him that he was being fired and placed on vocational rehabilitation. Barnes was represented by counsel for the workers' compensation claim, and she asked to be provided with a reason for his termination. None was provided.

On August 23, 2004, Dr. Firooz Mashhood confirmed that Barnes had degenerative joint disease of the hips and knee. Dr. Mashhood noted that Barnes indicated he believed he could return to his previous job. Dr. Mashhood agreed that Barnes could return to work full duty capacity, but

requested an MRI of the hip. Dr. Mashhood provided a progress report stating that Barnes should be returned to work full duty no restrictions on August 24, 2004. Barnes' attorney asked that he be returned to work based upon Dr. Mashhood's recommendation.

On September 26, 2004, Dr. James Dettling agreed with the diagnoses and prognosis by Dr. Braden and stated that Barnes should strongly consider a different position.

Notes from the third-party workers' compensation administrator dated October 2004, state that the employer does not want Barnes back at work and requests vocational rehabilitation.

Based on an evaluation by Dr. Braden and other doctors, Defendants believed that due to various impairments, in conjunction with his job duties, Barnes was at risk of further injury to his spine and hips.

Barnes testified that he believed that he was discriminated against because he knew of younger employees who were allowed to return to work after an injury. In addition, he observed supervisors Tony Levy and Charles Holloway assigning older workers to younger workers to break off older workers. Barnes described "break him off" to mean wearing out older slower workers by making them run after trucks to catch up, and eventually they would quit.

The workers' compensation insurer found that Barnes was unable to continue working in his Driver/Pitcher position. Barnes settled his claim in January 2005. Barnes received a lump sum payment for vocational rehabilitation of $15,000 and a lump sum payment for a permanent partial disability rating for his hip and spine of $39,452.58. Barnes claims that he was forced to accept the vocational rehabilitation over his request to return to work.

Barnes states that because Dr. Mashhood released him to go back to work on full duty on August 23, 2004, his termination from employment was unjustified. The EEOC argues that Barnes should not have been forced to accept the workers' compensation settlement, and instead he should have been put back in his old job or returned to a non-driving supervisory position.

Defendants argue that as with Thomas, there is no evidence that could support an inference of age discrimination with respect to the offer of vocational rehabilitation. This Court agrees.

Here, the fact that one doctor released him for work with no restrictions, does not create an issue of fact regarding Defendants' decision to rely on the workers' compensation insurer's, an independent party, finding that in turn was based upon two other medical opinions, that Barnes may severely injure himself or others if he maintained employment in the physically demanding job of a pitcher/driver. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1178–79 (10th Cir.2006) (an assertion that an employer's time estimates were unreasonable and thus a basis for a retaliatory motive for later termination may have shown a mistake but did not raise a genuine issue of material fact where undisputed evidence in the record revealed that the estimates had been reviewed for reasonableness and approved by others).

Moreover, Barnes has presented no evidence that could link the offer of settling the workers' compensation claim to his age. The EEOC presented no evidence that Barnes was forced to settle his claim. Even if Barnes felt he had no choice, the EEOC has not presented evidence that Barnes was forced out because of his age.

Finally, although Barnes was aware of the alleged "break him off" plan, he has

never claimed that he was injured as a result of this plan. Therefore, the EEOC has not presented any evidence that Barnes was offered vocational rehabilitation and a settlement of his injury based upon his age.

For these reasons, this Court GRANTS Defendants' summary judgment motion with respect to Barnes' claims.

### 6. *Laura Lucido*

██ Laura Lucido, born 1952, was hired as a data entry specialist in approximately 1983. In 2002, the employees in Lucido's department were moved to the second floor of the building and they began reporting to Laura's husband, Bernie Lucido. Prior to the move, Lucido reported to Sheryl Martello. People in the company were concerned about Lucido reporting to her husband and there were discussions of moving her elsewhere. Martello stated she would take her back and a few weeks prior to her termination offered Ms. Lucido a position in customer service. Martello states that Ms. Lucido turned down the offer because she wanted something in management and did not want to answer phones. Lucido testified that in 2002 Martello told her that they would be opening up a collection department and they wanted her to run it. The collection department, however, did not open until August 2004.

Ms. Lucido was terminated from employment on January 2, 2003. She was 50 years old at the time she was terminated. Steve Kalish and Martello made the decision to terminate her employment. Karen Van Der Linda, born 1964, assumed Lucido's job duties. Van Der Linda is 12 years younger than Lucido. Van Der Linda's duties were redistributed to other employees. Defendants assert that Lucido was terminated because she could not continue to report to her husband and no replacement position within the company had

been accepted. Ms. Lucido testified that she was not subjected to any age-related remarks by any management at RSSD.

The EEOC has not provided any evidence from which it could create a genuine issue of material fact that Defendants' legitimate reason for terminating Ms. Lucido was pretext for age discrimination. Accordingly, summary judgment is GRANTED with respect to Ms. Laura Lucido.

### II. *Pattern and Practice*

██ The EEOC attempted to rely on statistics to prove a pattern and practice of age discrimination with respect to the drivers employed by Defendants. The EEOC attached to its opposition a declaration by Marla Stern. Marla Stern is a Lead Systemic Investigator for the EEOC and she primarily investigates pattern and practice cases, performs statistical analysis using the Avail computer program, and trains others on conducting statistical analysis. The Avail program calculates the statistical significance of disparities in an employment selection process to help determine if the employer is employing a protected class at an expected rate. Ms. Stern used the Avail program to compare workforce data of Defendants with 2000 Census information. After applying the Fischer Exact Test, Ms. Stern states that "there is a statistical significance, in that the employer is under employing protected age group drivers when utilizing Clark County driver Census data.... The Avail results also shows that the Defendants employed – 258.34 fewer [protected age group] drivers than would have been expected when compared with the 2000 Census." (Stern Decl. ¶ 11.)

Defendants brought a motion to strike Stern's declaration, arguing that she was an expert witness who was not properly or timely disclosed. This Court agreed and

granted the motion to strike on November 26, 2008. (Doc. # 243.) This Court found that Stern's testimony regarding a statistical analysis was unquestionably expert testimony and the EEOC failed to name her as an expert on or before the deadline. The EEOC sought reconsideration of that order, and specifically asked that this Court consider portions of Stern's declaration. This Court denied the motion for reconsideration, stating that an expert was needed to explain whether the two groups that Stern sought to compare were in reality comparable and whether the difference between the two groups was statistically significant. Accordingly, the EEOC has no statistical evidence with respect to any category of employee.

Relying solely on the circumstances of the individuals in this case discussed above, the EEOC argues that Defendants, who employ approximately 1,700 individuals, engaged in a pattern and practice of age discrimination.

■■■■ In order to establish liability for a pattern and practice claim of age discrimination, a plaintiff bears the initial burden of proving disparate treatment based upon age. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). A pattern and practice claim must be based upon "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [must be] establish[ed] by a preponderance of the evidence that [age] discrimination was the company's standard operating procedure the regular rather than the unusual practice." *Id.* The plaintiff must show "a prima facie case of systematic and purposeful employment discrimination." *Id.* at 342, 97 S.Ct. 1843.

■■■■ Statistical and "anecdotal evidence of past discrimination can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices." *Obrey v. Johnson*, 400 F.3d 691, 698 (9th Cir.2005). Statistics are relevant to determining a pattern and practice claim because they "can be used to establish a general discriminatory pattern in an employer's ... practices. Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue." *Obrey*, 400 F.3d at 694. "[S]tatistical analyses have served and will continue to serve an important role in cases in which the existence of discrimination is a disputed issue." *Teamsters*, 431 U.S. at 339–40, 97 S.Ct. 1843 (citations and internal quotation marks omitted).

The EEOC did not provide any statistical analysis of Defendants' hiring and termination practices and a comparison of ages of persons employed with those in the community.[13] The EEOC cites *Teamsters* as support for its argument that the above instances are sufficient, without more, to create a genuine issue of fact of whether Defendants engaged in a pattern and practice of age discrimination. The EEOC's reliance is misplaced, however, because in *Teamsters*, the Supreme Court found that the Government carried its burden of proof because it provided statistical evidence that was bolstered by "the testimony of individuals who recounted over 40 specific instances of discrimination." *Teamsters*, 431 U.S. at 338, 97 S.Ct. 1843 (emphasis added).

The EEOC's reliance on *Dukes v. Wal–Mart, Inc.*, 509 F.3d 1168 (9th Cir.2007) is similarly misplaced. Like the Supreme

---

**13.** The EEOC attempted to provide statistics relating to drivers, however, this Court struck that evidence, as noted above.

Court in *Teamsters*, the Ninth Circuit considered the anecdotal and circumstantial evidence set forth in 120 declarations, *in addition to* the statistical evidence presented by the plaintiffs. Indeed, the Ninth Circuit stated that "[c]ircumstantial and anecdotal evidence of discrimination is commonly used in Title VII 'pattern and practice' cases *to bolster* statistical proof by bringing 'the cold numbers convincingly to life.'" *Id.* at 1182 (emphasis added). Neither of these cases represented a situation where no statistical evidence was presented and the anecdotal evidence alone was sufficient to withstand summary judgment.

As this Court has granted Defendants' motion to strike Marla Stern's Declaration, there is no statistical evidence currently before this Court from which this Court could make a comparison of percentages of those employed who are older or younger than 40 to the percentages of those terminated in the two age groups, or compare the ages of those hired to the ages of those in the community and determine if there was a statistically significant difference. The issue before this Court is whether the evidence of alleged disparate treatment discussed above is sufficient by itself to create a genuine issue of fact of whether age discrimination was Defendants' regular, rather than the unusual practice. This Court finds that is does not.

At most, in a company of 1,700, the EEOC created a genuine issue of fact as to whether individuals were terminated because of their age. With a such a large company with numerous supervisors and lines of business, possible instances of age discrimination do not create an issue of fact as to whether it was Defendants' usual practice to discriminate based on age. Instead, these instances are sporadic. Moreover, Defendants provided termination data for different transfer stations, types of jobs, and reasons for termination, as set forth above. None of that data created an inference of a pattern of age discrimination. Instead, the data created an inference that Defendants' policies were evenly enforced, regardless of age.

Accordingly, absent some statistical evidence, the EEOC's pattern and practice claim does not survive summary judgment. Defendants' motion with respect to this claim is GRANTED.

## CONCLUSION

For the reasons articulated above, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for summary judgment.

The Court GRANTS the summary judgment motion with respect to the disparate treatment claims of the following individuals: Randy Johnson; Daron Barnes–Reid; Eddie Wilson; Roderick Jones; Curtis Howard; Jesus Chanez; Lorrance Wilder, Jr.; Carlos Rasool as to the driver position; Albert Vassar; Dock Hines; Jimmy Hilton; James Cornell; Timothy Gittus; Jon Krieger; Elmo Walker; Laura Lucido; William Adams; Louis "Buster" Thomas; and Michael Barnes.

The Court DENIES the motion with respect to the disparate treatment claims of the following individuals: Jeffrey Banks; Ron Thompson, Sr.; Vincent Marrazzo; Manual Encinas; Carlos Rasool as to the mechanic position; Billy Taylor; David Suazo; Keith Brown; Mid Jackson; Nico Kelley; Eddie Williams; William Lacy; Robert LaRocca; Clayton Hickman; Kevin Stockton; Sharon Derengowski; Bernard Lucido; Michael Miller; and Jessie Williams.

This Court GRANTS the *motion* with respect to the EEOC's pattern and practice claim.

The Court DENIES Defendants' Motion to Strike New Portions of Plaintiffs Lacy's

and LaRocca's Opposition to Defendants' Motion for Summary Judgment and Declaration of Gerald Benford.

IT IS SO ORDERED.